## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

GEICO CORPORATION
GOVERNMENT EMPLOYEES INSURANCE
COMPANY
GEICO GENERAL INSURANCE COMPANY
GEICO INDEMNITY COMPANY
GEICO CASUALTY COMPANY
GEICO ADVANTAGE INSURANCE COMPANY
GEICO CHOICE INSURANCE COMPANY
GEICO SECURE INSURANCE COMPANY
GEICO COUNTY MUTUAL INSURANCE
COMPANY

     *Plaintiffs*

V.

Aisan Industry Co., Ltd.
Franklin Precision Industry, Inc.
Aisan Corporation of America
Hyundam Industrial Co., Ltd.
ALPHA Corporation
Alpha Technology Corporation
Alps Electric Co., Ltd.
Alps Electric (North America), Inc.
Alps Automotive Inc.
Robert Bosch GmbH
Robert Bosch LLC
Bridgestone Corporation
Bridgestone APM Company
Calsonic Kansei Corporation
Calsonic Kansei North America, Inc.
Chiyoda Manufacturing Corporation
Chiyoda USA Corporation
Continental Automotive Electronics LLC
Continental Automotive Korea Ltd
Continental Automotive Systems, Inc.

Case No.

**COMPLAINT AND**
**DEMAND FOR JURY**

Diamond Electric Mfg. Co., Ltd.
Diamond Electric Mfg. Corporation
Eberspächer Exhaust Technology GmbH & Co. KG
Eberspächer North America Inc.
Faurecia Abgastechnik GmbH
Faurecia Systèmes d'Échappement
Faurecia Emissions Control Technologies, USA, LLC
Faurecia Emissions Control Systems, N.A. LLC f/k/a
Faurecia Exhaust Systems, Inc.
Hitachi Automotive Systems, Ltd.
Hitachi Metals, Ltd.
Hitachi Cable America Inc.
Hitachi Metals America, Ltd.
INOAC Corporation
INOAC Group North America, LLC
INOAC USA Inc.
JTEKT Corporation
JTEKT Autmotive North America, Inc.
JTEKT North America Corp.
Kiekert AG
Kiekert U.S.A., Inc.
Koito Manufacuturing Co., Ltd.
North American Lighting, Inc.
MAHLE Behr GmbH & Co. KG
MAHLE Behr USA Inc.
MITSUBA Corporation
American Mitsuba Corporation
Nachi-Fujikoshi Corp.
Nachi America Inc.
NGK Insulators, Ltd.
NGK Autmotive Ceramics USA, Inc.
NGK Spark Plug Co., Ltd.
NTK Spark Plugs (U.S.A.), Inc.
Nishikawa Rubber Company, Ltd.
NTN Corporation
NTN USA Corporation
Sanden Automotive Components Corporation
Sanden Automotive Climate Systems Corporation
Sanden International (U.S.A.) Inc.

SKF USA Inc.
Stanley Electric Co., Ltd.
Stanley Electric U.S. Co., Inc.
II Stanley Co., Inc.
Tenneco Inc.
Tenneco GmbH
Tenneco Autmotive Operating Co., Inc.
Toyo Tire & Rubber Co. Ltd.
Toyo Tire North America OE Sales LLC
Toyo Autmotive Parts (U.S.A.), Inc.
Usui Kokusai Sangyo Kaisha, Ltd.
Usui International Corporation
Valeo S.A.
Yamada Manufacturing Co. Ltd.
Yamada North America, Inc.
Yamashita Rubber Co., Ltd.
YUSA Corporation

*Defendants.*

## COMPLAINT

Plaintiff GEICO Corporation and its affiliated entities, Government Employees Insurance Company, GEICO General Insurance Company, GEICO Indemnity Company, GEICO Casualty Company, GEICO Advantage Insurance Company, GEICO Choice Insurance Company, GEICO Secure Insurance Company and GEICO County Mutual Insurance Company, (collectively "GEICO") bring this action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection and unjust enrichment laws. GEICO demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.      GEICO brings this lawsuit against Aisan Industry Co., Ltd, Franklin Precision Industry, Inc., Aisan Corporation of America and Hyundam Industrial Co., Ltd. (collectively, "Aisan"); ALPHA Corporation and Alpha Technology Corporation (collectively, "ALPHA"); Alps Electric Co., Ltd., Alps Electric (North America), Inc. and Alps Automotive Inc. (collectively, "Alps"); Robert Bosch GmbH and Robert Bosch LLC (collectively, "Bosch"); Bridgestone Corporation and Bridgestone APM Company collectively, Bridgestone); Calsonic Kansei Corporation and Calsonic Kansei North America, Inc. (collectively, "Calsonic"); Chiyoda Manufacturing Corporation and Chiyoda USA Corporation (collectively,

1

"Chiyoda"); Continental Automotive Electronics LLC, Continental Automotive Korea Ltd and Continental Automotive Systems, Inc. (collectively, "Continental"); Diamond Electric Mfg. Co., Ltd. and Diamond Electric Mfg. Corporation (collectively, "Diamond Electric"); Eberspächer Exhaust Technology GmbH & Co. KG and Eberspächer North America Inc. (collectively, "Eberspächer"); Faurecia Abgastechnik GmbH, Faurecia Systèmes d'Échappement, Faurecia Emissions Control Technologies, USA, LLC and Faurecia Emissions Control Systems, N.A. LLC f/k/a Faurecia Exhaust Systems, Inc. (collectively, "Faurecia"); Hitachi Automotive Systems, Ltd. ("HIAMS"); Hitachi Metals, Ltd., Hitachi Cable America Inc. and Hitachi Metals America, Ltd. (collectively, "Hitachi Metals"); INOAC Corporation, INOAC Group North America, LLC and INOAC USA Inc. (collectively, "INOAC"); JTEKT Corporation, JTEKT Automotive North America, Inc. and JTEKT North America Corp. (formerly d/b/a Koyo Corporation of U.S.A.) (collectively, "JTEKT"); Kiekert AG and Kiekert U.S.A., Inc. (collectively, "Kiekert"); Koito Manufacturing Co., Ltd. and North American Lighting, Inc. (collectively, "KOITO"); MAHLE Behr GmbH & Co. KG and MAHLE Behr USA Inc. (collectively, "MAHLE Behr"); MITSUBA Corporation and American Mitsuba Corporation (collectively, "MITSUBA"); Nachi-Fujikoshi Corp. and Nachi America Inc. (collectively, "Nachi"); NGK Insulators, Ltd. and NGK Automotive Ceramics USA, Inc. (collectively, "NGK

2

Insulators"); NGK Spark Plug Co., Ltd. and NGK Spark Plugs (U.S.A.), Inc. (collectively, "NGK Spark Plugs"); Nishikawa Rubber Company, Ltd. ("Nishikawa"); NTN Corporation and NTN USA Corporation (collectively, "NTN"); Sanden Automotive Components Corporation, Sanden Automotive Climate Systems Corporation and Sanden International (U.S.A.) Inc. (collectively, "Sanden"); SKF USA Inc. ("SKF"); Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc. and II Stanley Co., Inc. (collectively, "Stanley"); Tenneco Inc., Tenneco GmbH and Tenneco Automotive Operating Co., Inc. (collectively, "Tenneco"); Toyo Tire & Rubber Co. Ltd., Toyo Tire North America OE Sales LLC and Toyo Auto Parts (U.S.A.), Inc. (collectively, "Toyo"); Usui Kokusai Sangyo Kaisha, Ltd. and Usui International Corporation (collectively, "Usui"); Valeo S.A. ("Valeo"); Yamada Manufacturing Co. Ltd. and Yamada North America, Inc. (collectively, "Yamada"); and Yamashita Rubber Co., Ltd. and YUSA Corporation (collectively, "Yamashita") (collectively "Defendants"), and unnamed co-conspirators, manufacturers and/or suppliers of Access Mechanisms, Air Conditioning Systems, Air Fuel Ratio Sensors, Anti-Vibrational Rubber Parts, Automatic Transmission Fluid Warmers ("ATF Warmers") and Oil Coolers, Automotive Bearings, Automotive Brake Hoses, Automotive Constant-Velocity-Joint Boot Products, Automotive Lamps, Automotive Steel Tubes, Automotive Wire Harness Systems, Body Sealings, Ceramic Substrates, Electric Powered

3

Steering Assemblies, Exhaust Systems, Fan Motors, Fuel Injection Systems, Heater Control Panels, High Intensity Discharge Ballasts, Ignition Coils, Instrument Panel Clusters, Interior Trim Products, Power Window Motors, Radiators, Shock Absorbers, Side Door Latches and Latch Minimodules, Spark Plugs, Standard Oxygen Sensors, Starters, Windshield Washer Systems and Windshield Wiper Systems (collectively "Auto Parts") for their participation in numerous, separate conspiracies, defined by Auto Part, involving unlawfully rigging bids, allocating markets and customers and fixing, raising, maintaining and/or stabilizing prices in the United States.

2.      The Auto Parts at issue were manufactured for use in various "Motor Vehicles." The term Motor Vehicles includes any self-propelled vehicle that does not operate on rails and is used for the transportation of passengers and/or property.

3.      The Defendants manufacture, market and/or sell Auto Parts throughout and into the United States. The Defendants and their co-conspirators participated in separate conspiracies, defined by Auto Part, and agreed to suppress and eliminate competition in the Auto Parts industry by agreeing to rig bids, allocate sales of and fix, raise and maintain the prices of Auto Parts sold to Motor Vehicle manufacturers, repair professionals and others in the United States.

4

4.     The U.S. Department of Justice ("DOJ") Antitrust Division's expansive and ongoing criminal investigation into illegal price-fixing and bid-rigging in the Auto Parts industry has become DOJ's largest simultaneous criminal antitrust investigation in its history.  As part of the criminal probe, the Federal Bureau of Investigation ("FBI") has executed search warrants and raided the offices of a number of Auto Parts manufacturers.  The widespread and global investigation has led to criminal charges and fines against dozens of corporations and Auto Parts executives.

5.     Defendants, co-conspirators of the Defendants in the *In re Auto Parts Antitrust Litigation* case (MDL No. 2311) and unnamed co-conspirators have agreed to plead guilty to conspiracies to fix prices and rig bids for specific Auto Parts.  Defendants and their co-conspirators have paid criminal fines, and their executives have been sentenced to prison time.

6.     To date, the ongoing cartel investigation of price fixing and bid rigging in the Auto Parts industry has yielded more than $2.9 billion in criminal fines.  New cases continue to arise "with regularity" and former Attorney General Eric Holder promised that DOJ "would check under every hood and kick every tire."

7.     Defendants' conspiracies and agreements to fix prices, rig bids and allocate markets unlawfully restrained interstate and foreign trade and commerce

in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and various state antitrust, unfair competition, consumer protection and unjust enrichment laws detailed below.

8.      According to former Attorney General Eric Holder, "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers, and more than 25 million cars purchased by American consumers" and "lasted for a decade or longer" in some instances.

9.      As a direct result of the anticompetitive and unlawful conduct alleged, GEICO paid and reimbursed its insureds and third-party claimants for artificially inflated prices for Auto Parts and Motor Vehicles from at least 1995 through today, as GEICO continues to suffer lasting price effects from Defendants' unlawful conspiracies.  GEICO also was directly injured when it purchased Motor Vehicles and parts for its extensive fleet program.  GEICO has thereby suffered antitrust injury to its business and property.

## JURISDICTION AND VENUE

10.      GEICO brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  GEICO also asserts claims under various state antitrust, unfair competition, consumer protection and unjust enrichment laws.  GEICO seeks to obtain restitution, recover actual and exemplary

6

damages and secure other relief against the Defendants for violations of those state laws.  In addition, GEICO seeks attorneys' fees, costs and other expenses under federal and state law.

11.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1) and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(a) and 1367 because: (i) the matter in controversy exceeds $75,000 and GEICO is a citizen of a different state than some Defendants and (ii) GEICO's state law claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) because one or more of the Defendants resides or transacts business in this District.  Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides, is licensed to do business in, is doing business in, has agents in and/or is found or transacts business in this District.

7

13.     This Court has *in personam* jurisdiction over the Defendants because each, either directly or through the ownership and/or control of its subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Auto Parts throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and/or (d) was engaged in illegal price-fixing, bid rigging and market allocation conspiracies that were directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in or doing business throughout this District and the United States.  The Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

14.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

15.     The activities of the Defendants and their co-conspirators were intended to, and did have, a substantial effect on interstate commerce of the United States.  The Defendants' products are sold in interstate commerce.

16.     Auto Parts manufactured abroad by the Defendants and sold for use in Motor Vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Auto Parts are purchased in the United States, and such Auto Parts do not constitute import commerce, the Defendants' activities with respect thereto had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

17.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to GEICO.  The Defendants, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain and/or stabilize prices, to rig bids and to allocate markets in the United States for Auto Parts, which unreasonably restrained trade.

## PARTIES

### Plaintiffs - GEICO

18.     Plaintiff GEICO Corporation is a Maryland corporation with its principal place of business in Chevy Chase, Maryland.  GEICO Corporation purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant

Time Periods (defined below).  GEICO Corporation also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

19.    Government Employees Insurance Company is a Maryland corporation with its principal place of business in Bethesda, Maryland.  It is a wholly-owned subsidiary of GEICO Corporation.  Government Employees Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.  Government Employees Insurance Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

20.    GEICO General Insurance Company is a Maryland corporation with its principal place of business in Chevy Chase, Maryland.  It is a wholly-owned subsidiary of GEICO Corporation.  GEICO General Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.  GEICO General Insurance Company also purchased Motor Vehicles containing

those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

21.    GEICO Indemnity Company is a Maryland corporation with its principal place of business in Washington, DC.  GEICO Indemnity Company is a wholly-owned subsidiary of GEICO Corporation.  GEICO Indemnity Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.  GEICO Indemnity Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

22.    GEICO Casualty Company is a Maryland corporation with its principal place of business in Washington, DC.  It is a wholly-owned subsidiary of GEICO Corporation.  GEICO Casualty Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.  GEICO Casualty Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

11

23.     GEICO Advantage Insurance Company is a Nebraska Corporation with its principal place of business in Washington, DC.  It is a wholly-owned subsidiary of GEICO Corporation.   GEICO Advantage Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.   GEICO Advantage Insurance Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

24.     GEICO Choice Insurance Company is a Nebraska corporation with its principal place of business in Washington, DC.  It is a wholly-owned subsidiary of GEICO Corporation.  GEICO Choice Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods.  GEICO Choice Insurance Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles— for its extensive fleet program during the Relevant Time Periods.

25.     GEICO Secure Insurance Company is a Nebraska corporation with its principal place of business in Washington, DC.  It is a wholly-owned subsidiary of GEICO Corporation.  GEICO Secure Insurance Company purchased Auto Parts

12

and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods. GEICO Secure Insurance Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles— for its extensive fleet program during the Relevant Time Periods.

26. GEICO County Mutual Insurance Company is a Texas corporation with its principal place of business in Dallas, Texas. It is a wholly-owned subsidiary of GEICO Corporation. GEICO County Mutual Insurance Company purchased Auto Parts and reimbursed its insureds and third-party claimants for their purchase of Auto Parts from one or more Defendants during the Relevant Time Periods. GEICO County Mutual Insurance Company also purchased Motor Vehicles containing those parts from one or more Defendants—and replacement parts for those Motor Vehicles—for its extensive fleet program during the Relevant Time Periods.

**Defendants**

***The Aisan Defendants***

27. Defendant Aisan Industry Co., Ltd. is a Japanese corporation with its principal place of business in Obu, Japan. Aisan Industry Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed and/or sold Fuel Injection Systems that were purchased

13

and sold throughout the United States, including in this District, during the Relevant Time Period.

28.    Defendant Franklin Precision Industry, Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky.  Franklin Precision Industry, Inc. is a subsidiary of and wholly owned and/or controlled by its parent, Aisan Industry Co., Ltd.  Franklin Precision Industry, Inc. manufactured, marketed and/or sold Fuel Injection Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Aisan Industry Co.

29.    Defendant Aisan Corporation of America is an Illinois corporation with its principal place of business in Franklin, Tennessee.  Aisan Corporation of America is a subsidiary of and wholly owned and/or controlled by its parent, Aisan Industry Co., Ltd.  Aisan Corporation of America manufactured, marketed and/or sold Fuel Injection Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Aisan Industry Co.

30.    Defendant Hyundam Industrial Co., Ltd. is a Korean corporation with its principal place of business in Asan-si, South Korea.  It is a subsidiary of and

14

wholly owned and/or controlled by its parent, Aisan Industry Co., Ltd. Defendant Hyundam Industrial Co., Ltd. manufactured, marketed and/or sold Fuel Injection Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Aisan Industry Co.

**The ALPHA Defendants**

31. Defendant ALPHA Corporation is a Japanese corporation with its principal place of business in Yokohama, Japan. Defendant ALPHA Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Access Mechanisms that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

32. Defendant Alpha Technology Corporation is a Michigan corporation with its principal place of business in Howell, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, ALPHA Corporation. Defendant Alpha Technology Corporation manufactured, marketed and/or sold Access Mechanisms that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant

Time Period, its activities in the United States were under the control and direction of ALPHA Corporation.

***The Alps Defendants***

33.    Defendant Alps Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Alps Electric Co., Ltd.— directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed and/or sold Heater Control Panels that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

34.    Defendant Alps Electric (North America), Inc. is a California corporation with its principal place of business in Campbell, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Alps Electric Co., Ltd.  Defendant Alps Electric (North America), Inc. manufactured, marketed and/or sold Heater Control Panels that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Alps Electric Co.

35.    Defendant Alps Automotive Inc. is a Michigan corporation with its principal place of business in Auburn Hills, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Alps Electric Co., Ltd.  Defendant

16

Alps Automotive Inc. manufactured, marketed and/or sold Heater Control Panels that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Alps Electric Co.

### The Bosch Defendants

36. Defendant Robert Bosch GmbH is a German company with its headquarters in Stuttgart, Germany. Robert Bosch GmbH—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Windshield Wiper Systems, Starters, Fuel Injection Systems and Spark Plugs that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

37. Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan. It is an affiliate of and wholly controlled by Robert Bosch GmbH. Robert Bosch LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Windshield Wiper Systems, Starters, Fuel Injection Systems and Spark Plugs that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the

17

Relevant Time Period, its activities in the United States were under the control and direction of Robert Bosch GmbH.

### The Bridgestone Defendants

38.    Defendant Bridgestone Corporation is a Japanese corporation with its principal place of business in Kyobashi, Tokyo, Japan.  Bridgestone Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibrational Rubber Parts that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

39.    Defendant Bridgestone APM Company is a Delaware company with its principal place of business in Findlay, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Bridgestone Corporation.  Bridgestone APM Company manufactured, marketed, and/or sold Anti-Vibrational Rubber Parts that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Bridgestone Corporation.

### The Calsonic Defendants

40.    Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama, Japan.  Defendant Calsonic Kansei

18

Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Air Conditioning Systems, ATF Warmers and Oil Coolers and Radiators that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

41.     Defendant Calsonic Kansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee.  It is a subsidiary of and wholly owned and/or controlled by its parent, Calsonic Kansei Corporation.  Defendant Calsonic Kansei North America, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Air Conditioning Systems, ATF Warmers and Oil Coolers and Radiators that were sold and purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Calsonic Kansei Corporation.

### The Chiyoda Defendants

42.     Defendant Chiyoda Manufacturing Corporation is a Japanese corporation with its principal place of business in Takamatsu, Japan.  Chiyoda Manufacturing Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive

19

Wire Harness Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

43.    Defendant Chiyoda USA Corporation is a Delaware corporation with its principal place of business in Greencastle, Indiana.  It is a subsidiary of and wholly owned and/or controlled by its parent, Chiyoda Manufacturing Corporation. Chiyoda USA Corporation, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Chiyoda Manufacturing Corporation.

### The Continental Defendants

44.    Defendant Continental Automotive Electronics LLC is a Korean company with its principal place of business in Bugang-myeon, South Korea. Continental Automotive Electronics LLC—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, marketed and/or sold Instrument Panel Clusters that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

45.    Defendant Continental Automotive Korea Ltd. is a Korean company with its principal place of business in Seongnam-si, South Korea.  It is an affiliate

of and wholly controlled by Continental Automotive Electronics LLC.  Continental Automotive Korea Ltd.—directly and/or through its affiliates, which it wholly owned and/or controlled—manufactured, marketed and/or sold Instrument Panel Clusters that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

46.     Defendant Continental Automotive Systems, Inc. is a Delaware company with its principal place of business in Auburn Hills, Michigan.  It is an affiliate of and wholly controlled by Continental Automotive Electronics LLC. Continental Automotive Systems, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Instrument Panel Clusters that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

### The Diamond Electric Defendants

47.     Defendant Diamond Electric Mfg. Co., Ltd. is a Japanese company with its principal place of business in Osaka, Japan.  Diamond Electric Mfg. Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Ignition Coils that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

21

48.   Defendant Diamond Electric Mfg. Corporation is a Michigan corporation with its principal place of business in Dundee, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Diamond Electric Mfg. Co., Ltd.   Diamond Electric Mfg. Corporation manufactured, marketed and/or sold Ignition Coils that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Diamond Electric Mfg. Co.

### The Eberspächer Defendants

49.   Defendant Eberspächer Exhaust Technology GmbH & Co. KG is a German company with its principal place of business in Esslingen, Germany. Defendant Eberspächer Exhaust Technology GmbH & Co. KG—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

50.   Defendant Eberspächer North America Inc. is a Delaware corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly owned and/or controlled by Defendant Eberspächer Exhaust Technology GmbH & Co. KG.  Defendant Eberspächer North America Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured,

22

marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Eberspächer Exhaust Technology GmbH & Co. KG.

### The Faurecia Defendants

51.    Defendant Faurecia Abgastechnik GmbH is a German company with its principal place of business in Augsburg, Germany. It is a subsidiary of and wholly owned and/or controlled by Faurecia Automotive GmbH. It designs, engineers and manufactures Exhaust Systems for sale worldwide. Defendant Faurecia Abgastechnik GmbH—directly and/or through its subsidiaries, which it wholly-owned and/or controlled—manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District during the Relevant Time Period.

52.    Defendant Faurecia Systèmes d'Échappement is a French company with its headquarters in Nanterre, France, where the global headquarters of Faurecia SA is also located. It is a subsidiary of and wholly owned and/or controlled by Faurecia SA. Defendant Faurecia Systèmes d'Échappement— directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed and/or sold Exhaust Systems that were purchased and sold

23

throughout the United States, including in this District during the Relevant Time Period.

53.     Defendant Faurecia Emissions Control Technologies, USA, LLC ("FECT USA") is a Delaware limited liability company with its principal place of business in Columbus, Indiana.  It is a subsidiary of, and 100% wholly-owned and controlled by, Faurecia USA Holdings, Inc., which is owned and controlled by Faurecia SA.  In 2007, EMCON Technologies LLC ("EMCON") was created to house the recently acquired exhaust systems business of ArvinMeritor, Inc. by the investment group One Equity Partners.  In late 2009 or early 2010, Faurecia acquired EMCON.  As reported by Faurecia in its 2009 Annual Report, EMCON was subsequently "incorporated into Faurecia's Exhaust Systems business to form [FECT USA]."  Defendant FECT USA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

54.     Faurecia Emissions Control Systems, N.A., LLC f/k/a Faurecia Exhaust Systems, Inc. ("Faurecia Exhaust Systems") is a Delaware limited liability company with its principal office in Toledo, Ohio.  It is a subsidiary of, and 100% wholly-owned and controlled by, FECT USA.  In December, 1999, Faurecia SA acquired AP Automotive Systems, Inc.  The acquisition resulted in the creation of

24

two entities: (1) Faurecia Exhaust Systems, LLC and (2) Faurecia Exhaust Systems, Inc.  Defendant Faurecia Exhaust Systems—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District during the Relevant Time Period.

### The HIAMS Defendant

55.     Defendant Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi Automotive Systems, Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Shock Absorbers that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

### The Hitachi Metals Defendants

56.     Defendant Hitachi Metals, Ltd. is a Japanese company with its principal place of business in Tokyo, Japan.  Hitachi Metals, Ltd. is the successor-in-interest to Hitachi Cable, Ltd., a Japanese company that merged with Hitachi Metals, Ltd. in July 2013.  Any reference to Defendant Hitachi Metals, Ltd. in this Complaint includes Hitachi Cable, Ltd. Hitachi Metals, Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Brake Hoses that were purchased and sold

throughout the United States, including in this District, during the Relevant Time Period.

57. Defendant Hitachi Metals America, Ltd. is a New York corporation with its principal place of business in Purchase, New York. It is a subsidiary of, and wholly owned and/or controlled by, its parent, Hitachi Metals, Ltd. Hitachi Metals America, Ltd. manufactured, marketed and/or sold Automotive Brake Hoses that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Hitachi Metals, Ltd.

58. Defendant Hitachi Cable America, Inc. is a New York corporation with its principal place of business in Purchase, New York. It is a subsidiary of, and wholly owned and/or controlled by, Hitachi Metals America, Ltd. Hitachi Cable America, Inc. manufactured, marketed and/or sold Automotive Brake Hoses that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Hitachi Metals America.

*The INOAC Defendants*

59.     INOAC Corporation is a Japanese corporation with its principal place of business in Nagoya, Japan.  INOAC Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Interior Trim Products that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

60.     INOAC Group North America, LLC is a Delaware corporation with its principal place of business in Springfield, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, INOAC Corporation.  INOAC Group North America, LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Interior Trim Products that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of INOAC Corporation.

61.     INOAC USA Inc. is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, INOAC Corporation.  INOAC USA Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Interior Trim Products that were purchased and sold

27

throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of INOAC Corporation.

### The JTEKT Defendants

62. Defendant JTEKT Corporation is a Japanese company with its principal place of business in Osaka, Japan. JTEKT Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Bearings and Electric Powered Steering Assemblies that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

63. Defendant JTEKT Automotive North America, Inc., d/b/a JTEKT North America, Inc., is a Delaware corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, JTEKT Corporation. Defendant JTEKT Automotive North America, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Bearings and Electric Powered Steering Assemblies that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of JTEKT Corporation.

64.     Defendant JTEKT North America Corporation (formerly d/b/a Koyo Corporation of U.S.A.) is a South Carolina corporation with its principal place of business in Westlake, Ohio.  It is a subsidiary of, and wholly-owned or controlled by, its parent, JTEKT Corporation.  Defendant JEKT North America Corporation sold Automotive Bearings and Electric Powered Steering Assemblies that were purchased and sold in the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of JTEKT Corporation.

### The Kiekert Defendants

65.     Defendant Kiekert AG is a German corporation organized and existing under the laws of Germany with its principal place of business in Heiligenhaus, Germany.  During the Relevant Time Period, Defendant Kiekert AG—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Side Door Latches and Latch Minimodules that were purchased and sold throughout the United States, including in this District.

66.     Defendant Kiekert U.S.A., Inc. is a Delaware corporation with its principal place of business at 46941 Liberty Drive, Wixom, Michigan 48393. Kiekert U.S.A., Inc. is a subsidiary and wholly owned and/or controlled by its parent, Kiekert AG.  Defendant Kiekert U.S.A., Inc. manufactured, marketed

29

and/or sold Side Door Latches and Latch Minimodules that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, Defendant Kiekert U.S.A., Inc's activities in the United States were under the control and direction of Kiekert AG.

### The KOITO Defendants

67.     Defendant Koito Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Koito Manufacturing Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Lamps and HID Ballasts that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

68.     Defendant North American Lighting, Inc. is a Michigan corporation with its principal place of business in Illinois.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Koito Manufacturing Co., Ltd.  North American Lighting, Inc. manufactured, marketed, and/or sold Automotive Lamps and HID Ballasts that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Koito Manufacturing Co.

30

*The MAHLE Behr Defendants*

69.     Defendant MAHLE Behr GmbH & Co. KG is a German corporation with its principal place of business in Stuttgart, Germany.  In 2013, MAHLE Behr GmbH acquired the Air Conditioning Systems business of Behr GmbH & Co. KG ("Behr"), and, upon information and belief, assumed Behr's liabilities.  As a result of the acquisition, MAHLE Behr GmbH—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Air Conditioning Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

70.     Defendant MAHLE Behr USA Inc. is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, MAHLE Behr GmbH.  MAHLE Behr USA Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Air Conditioning Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of MAHLE Behr GmbH.

*The MITSUBA Defendants*

71.    Defendant MITSUBA Corporation is a Japanese corporation with its principal place of business in Gunma, Japan.  MITSUBA Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Lamps, Electric Powered Steering Assemblies, Fan Motors, Fuel Injection Systems, Power Window Motors, Radiators, Starters, Windshield Washer Systems and Windshield Wiper Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

72.    Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, MITSUBA Corporation.  American Mitsuba Corporation manufactured, marketed and/or sold Automotive Lamps, Electric Powered Steering Assemblies, Fan Motors, Fuel Injection Systems, Power Window Motors, Radiators, Starters, Windshield Washer Systems and Windshield Wiper Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of MITSUBA Corporation.

32

### The Nachi Defendants

73.    Defendant Nachi-Fujikoshi Corp. ("Nachi-Fujikoshi") is a Japanese corporation with its principal place of business in Toyama, Japan.    Nachi-Fujikoshi—directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

74.    Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana.    It is a subsidiary of, and wholly owned or controlled by, its parent, Nachi-Fujikoshi. Defendant Nachi America sold Automotive Bearings that were purchased and sold in the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Nachi-Fujikoshi.

### The NGK Insulators Defendants

75.    Defendant NGK Insulators, Ltd. is a Japanese corporation with its principal place of business in Nagoya, Japan.    NGK Insulators Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed and/or sold Ceramic Substrates that were purchased and

sold throughout the United States, including in this District, during the Relevant Time Period.

76. Defendant NGK Automotive Ceramics USA, Inc. is a Delaware corporation with its principal place of business in Novi, Michigan. It is a subsidiary of, and wholly owned and/or controlled by, its Japanese parent, NGK Insulators Ltd. NGK Automotive Ceramics USA, Inc. manufactured, marketed and/or sold Ceramic Substrates that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of NGK Insulators Ltd.

### The NGK Spark Plug Defendants

77. Defendant NGK Spark Plug Co., Ltd. is a Japanese corporation. NGK Spark Plug Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Spark Plugs, Standard Oxygen Sensors and Air Fuel Ratio Sensors that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

78. Defendant NGK Spark Plugs (U.S.A.), Inc. is a California corporation with its principal place of business in Wixom, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, NGK Spark Plug Co., Ltd.

Defendant NGK Spark Plugs (U.S.A.), Inc. manufactured, marketed and/or sold Spark Plugs, Standard Oxygen Sensors and Air Fuel Ratio Sensors that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

### The Nishikawa Defendant

79.    Defendant Nishikawa Rubber Company, Ltd. ("Nishikawa Rubber") is a Japanese corporation with its principal place of business in Hiroshima, Japan. Nishikawa Rubber—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Body Sealings that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

### The NTN Defendants

80.    Defendant NTN Corporation is a Japanese corporation with its principal place of business in Osaka, Japan.  NTN Corporation—directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Automotive Bearings that were purchased and sold throughout the United States, including in this district, during the Relevant Time Period.

81.    Defendant NTN USA Corporation ("NTN USA") is a Delaware corporation with its principal place of business in Mount Prospect, Illinois.  NTN USA—directly and/or through its wholly owned and/or controlled subsidiaries—

35

manufactured, marketed and/or sold Automotive Bearings that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

### The Sanden Defendants

82.    Defendant Sanden Automotive Components Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  It is a subsidiary of and wholly owned and controlled by its parent, Sanden Holdings Corporation. Sanden Holdings Corporation is a holding company, formed after the restructuring of the former Sanden Corporation.  Sanden Automotive Components Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Air Conditioning Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

83.    Defendant Sanden Automotive Climate Systems Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  It is a subsidiary of and wholly owned and controlled by its parent, Sanden Holdings Corporation.  Sanden Automotive Climate Systems Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Air Conditioning Systems that were purchased and sold

throughout the United States, including in this District, during the Relevant Time Period.

84.    Defendant Sanden International (U.S.A.) Inc. is a Texas corporation with its principal place of business in Wylie, Texas.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sanden Holdings Corporation. Sanden International (U.S.A.) Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Air Conditioning Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

### The SKF Defendant

85.    Defendant SKF USA, Inc. ("SKF USA") is a Delaware corporation with its principal place of business in Lansdale, Pennsylvania.  It is a subsidiary of, and wholly-owned or controlled by, its parent, SKF Group.  Defendant SKF USA sold Automotive Bearings that were purchased and sold in the United States, including in this District, during the Relevant Time Period.

### The Stanley Defendants

86.    Defendant Stanley Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Stanley Electric Co.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Lamps and HID Ballasts that were purchased

37

and sold throughout the United States, including in this District, during the Relevant Time Period.

87.    Defendant Stanley Electric U.S. Co., Inc. is an Ohio corporation with its principal place of business in Ohio.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Stanley Electric Co., Ltd.  Stanley Electric U.S. Co., Inc. manufactured, marketed, and/or sold Automotive Lamps and HID Ballasts that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Stanley Electric Co.

88.    Defendant II Stanley Co., Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Stanley Electric Co., Ltd.  II Stanley Co., Inc. manufactured, marketed, and/or sold Automotive Lamps and HID Ballasts that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Stanley Electric Co.

*The Tenneco Defendants*

89.    Defendant Tenneco Inc. (formerly Tenneco Automotive) is a Delaware corporation with its headquarters in Lake Forest, Illinois.  Defendant Tenneco Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

90.    Defendant Tenneco GmbH is a German company with its office in Edenkoben, Germany.  It is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco Inc.  Defendant Tenneco GmbH manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this district, during the Relevant Time Period.

91.    Defendant Tenneco Automotive Operating Co., Inc. is a Delaware corporation with its headquarters in Lake Forest, Illinois.  It is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco Inc.  Defendant Tenneco Automotive Operating Co., Inc. manufactured, marketed and/or sold Exhaust Systems that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Tenneco Inc.

39

*The Toyo Defendants*

92.    Defendant Toyo Tire & Rubber Co. Ltd. is a Japanese company with its principal place of business in Osaka, Japan.  Defendant Toyo Tire & Rubber Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Anti-Vibrational Rubber Parts and Automotive Constant-Velocity-Joint Boot Products that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

93.    Defendant Toyo Tire North America OE Sales LLC is a California company with its principal place of business in White, Georgia.  It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd. Toyo Tire North America OE Sales LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibrational Rubber Parts and Automotive Constant-Velocity-Joint Boot Products that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Toyo Tire & Rubber Co.

94.    Defendant Toyo Auto Parts (U.S.A.), Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky.  It is a subsidiary of and

wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd. Toyo Auto Parts (USA), Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibrational Rubber Parts and Automotive Constant-Velocity-Joint Boot Products that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Toyo Tire & Rubber Co.

### The Usui Defendants

95. Defendant Usui Kokusai Sangyo Kaisha, Ltd. ("Usui Kokusai") is a Japanese corporation with its headquarters in Shimizu, Japan. During the Relevant Time Period, Usui Kokusai—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Automotive Steel Tubes that were purchased and sold throughout the United States, including in this District.

96. Defendant Usui International Corporation is a Michigan corporation with its principal place of business in Plymouth, Michigan. Usui International Corporation is a subsidiary of and wholly owned and/or controlled by its parent Usui Kokusai. Usui International Corporation manufactured, marketed and/or sold Automotive Steel Tubes that were purchased and sold throughout the United

41

States, including in this District, during the Relevant Time Period.  At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Usui Kokusai.

*The Valeo Defendant*

97.    Defendant Valeo S.A. is a French société anonyme with its principal place of business in Paris, France.  Defendant Valeo—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Access Mechanisms that were purchased and sold throughout the United States, including in this District, during the Relevant Time Period.

*The Yamada Defendants*

98.    Defendant Yamada Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Kiryu City, Gunma Prefecture, Japan. Yamada Manufacturing Co., Ltd.—directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Electric Powered Steering Assemblies that were purchased and sold throughout the United States, including in this district, during the Relevant Time Period.

99.    Defendant Yamada North America, Inc. is an Ohio corporation with its principal place of business in South Charleston, Ohio.  It is a subsidiary of, and wholly owned or controlled by, its parent, Yamada Manufacturing Co., Ltd. Defendant Yamada North America, Inc. manufactured, marketed and/or sold

Electric Powered Steering Assemblies that were purchased and sold in the United States, including in this District, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of Yamada Manufacturing Co., Ltd.

### The Yamashita Defendants

100. Defendant Yamashita Rubber Co., Ltd. ("Yamashita Ruber") is a Japanese corporation with its principal place of business in Saitama, Japan. Yamashita Rubber—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Anti-Vibrational Rubber Parts that were purchased manufactured, marketed and/or sold throughout the United States, including in this District, during the Relevant Time Period.

101. Defendant YUSA Corporation ("YUSA") is an Ohio corporation with its principal place of business in Washington Court House, Ohio. It is a subsidiary of and wholly owned and/or controlled by its parent, Yamashita Rubber. YUSA manufactured, marketed and/or sold Anti-Vibrational Rubber Parts that were purchased manufactured, marketed and/or sold throughout the United States, including in this District, during the Relevant Time Period.

## AGENTS AND CO-CONSPIRATORS

102. Within each distinct Auto Part conspiracy, each Defendant acted as the principal of or agent for the other Defendants and other co-conspirators with

43

respect to the acts, violations and common course of conduct alleged within that Auto Part conspiracy.

103.   Others have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint—including non-settling and settling defendants from the *In re Auto Parts Antitrust Litigation*, MDL No. 2311, various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit and other individuals whose identities are presently unknown—and have performed acts and made statements in furtherance of the conspiracies.

104.   In this Complaint, when reference is made to any act, deed or transaction of any corporation, limited liability entity or other business structure, the allegation means that the corporation, limited liability entity or business engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the business or affairs of the corporation, limited liability entity or business.

## FACTUAL ALLEGATIONS

### I.   Defendants and Their Co-Conspirators Entered into Multiple, Distinct Auto Part Conspiracies

105.   Original equipment manufacturers ("OEMs") install Auto Parts in new cars as part of the automotive manufacturing process.   OEMs purchase Auto Parts directly from Defendants for installation in new Motor Vehicles.   When purchasing Auto Parts, OEMs issue Requests for Quotation ("RFQs") to Auto Parts manufacturers.   In response to a RFQ, Auto Parts manufacturers submit quotations, or bids, to OEMs.   The OEMs then select an Auto Parts manufacturer (or sometimes more than one) and enter into contracts typically lasting for four to six years.

106.   Repair professionals also install Auto Parts—including OEM parts— in Motor Vehicles to replace worn out, defective or damaged parts.

107.   Defendants and their co-conspirators supplied Auto Parts to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.   Defendants and their co-conspirators also supplied Auto Parts to automotive repair professionals located in the United States.   Defendants and their co-conspirators manufactured Auto Parts (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles

45

manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

108.   GEICO purchased or reimbursed its insureds and third-party claimants for Auto Parts from Defendants in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Auto Parts after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Auto Parts from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Auto Parts, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement parts and new Motor Vehicles for its fleet program.

109.   As a result of Defendants' conspiracies, GEICO paid unlawful supra-competitive prices for Auto Parts and Motor Vehicles.

a.      In those instances where GEICO directly paid repair professionals for Auto Parts, the retail part price is determined as part of the estimate before the repair shop orders the part.

b.      In those instances where GEICO reimburses its insureds or claimants for their purchase of Auto Parts from repair professionals, the retail part price is determined as part of the estimate before the shop orders the part.  In some instances, the insured or claimant may decide to accept

reimbursement payment from GEICO—based on the repair estimate—but not repair the Motor Vehicle, and no part is purchased.

        c.     GEICO reviews estimates and inspects Motor Vehicles following an accident to determine if the Motor Vehicle should be declared a total loss.  When Auto Parts prices are elevated, the frequency in which GEICO declares a Motor Vehicle a total loss increases (based on the estimates, which are inflated by the price-fixed Auto Parts) and the amount of the total loss valuation is similarly elevated.

        d.     GEICO purchases Motor Vehicles for its fleet program. GEICO employees use these Motor Vehicles as part of their employment to travel to repair shops to inspect Motor Vehicles and meet with insureds and claimants.

110.  Defendants and their co-conspirators entered into numerous, distinct Auto Parts conspiracies to rig bids, allocate markets and fix prices. According to Scott D. Hammond, former Assistant Attorney General of DOJ's Antitrust Division's Criminal Enforcement Program, in September 2013, there were more than a dozen separate conspiracies each operating independently but all targeting the U.S. automotive industry.  The Auto Parts conspiracies challenged in this Complaint include:

### A. The Access Mechanisms Conspiracy

111.   "Access Mechanisms" are (1) inside and outside door handles, tailgate and trunk handles; (2) keys, lock sets (also known as key sets), and door locks (including free-wheel door locks); and (3) electrical steering column locks and mechanical steering column locks.

112.   ALPHA, Valeo and their co-conspirators supplied Access Mechanisms to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.   ALPHA, Valeo and their co-conspirators also supplied Access Mechanisms to automotive repair professionals located in the United States. ALPHA, Valeo and their co-conspirators manufactured Access Mechanisms (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

113.   ALPHA and Valeo conspired with other manufacturers of Access Mechanisms to rig bids, allocate markets and fix, raise, stabilize and control prices of Access Mechanisms from at least January 2002 and continuing until at least September 2016 ("Access Mechanisms Relevant Time Period").

114.   GEICO purchased or reimbursed its insureds and third-party claimants for Access Mechanisms from ALPHA, Valeo and their co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Access Mechanisms after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Access Mechanisms from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Access Mechanisms, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Access Mechanisms and new Motor Vehicles containing price-fixed Access Mechanisms for its fleet program.

115.   The Access Mechanisms Conspiracy caused GEICO to pay supra-competitive prices for Access Mechanisms and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of ALPHA, Valeo and their co-conspirators' unlawful conduct continue to be felt.

### B. The Air Conditioning Systems Conspiracy

116.   "Air Conditioning Systems," are systems that cool the interior environment of a Motor Vehicle and are part of the thermal segment of the automotive market.   Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following: automotive compressors, condensers, HVAC units (typically consisting of a blower motor,

49

actuators, flaps, evaporator, heater core and filter embedded in a plastic housing), control panels, sensors and associated hoses and pipes.[1]

117. Calsonic, MAHLE Behr, Sanden ("Air Conditioning System Defendants") and their co-conspirators supplied Air Conditioning Systems to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. The Air Conditioning System Defendants and their co-conspirators also supplied Air Conditioning Systems to automotive repair professionals located in the United States. The Air Conditioning System Defendants and their co-conspirators manufactured Air Conditioning Systems (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

118. The Air Conditioning System Defendants conspired with other manufacturers of Air Conditioning Systems to rig bids, allocate markets and fix, raise, stabilize and control prices of Air Conditioning Systems from at least May

---

[1] It is possible the Air Conditioning System conspiracy overlapped with the Heater Control Panel conspiracy.

1999 and continuing until at least January 2015 ("Air Conditioning Systems Relevant Time Period").

119.   GEICO purchased or reimbursed its insureds and third-party claimants for Air Conditioning Systems from Air Conditioning Defendants and their co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for Air Conditioning Systems after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Air Conditioning Systems from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Air Conditioning Systems, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement Air Conditioning Systems and new Motor Vehicles containing price-fixed Air Conditioning Systems for its fleet program.

120.   The Air Conditioning Systems Conspiracy caused GEICO to pay supra-competitive prices for Air Conditioning Systems and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Calsonic, MAHLE Behr, Sanden and their co-conspirators' unlawful conduct continue to be felt.

51

## C. The Air Fuel Ratio Sensors Conspiracy

121.   "Air Fuel Ratio Sensors" are a type of "wideband" oxygen sensors that enable more precise control of the air-to-fuel ratio injected into the engine.

122.   NGK Spark Plugs and its co-conspirators supplied Air Fuel Ratio Sensors ("AFRS") to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  NGK Spark Plugs and its co-conspirators also supplied AFRS to automotive repair professionals located in the United States. NGK Spark Plugs and its co-conspirators manufactured AFRS: (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

123.   NGK Spark Plugs conspired with other manufacturers of AFRS to rig bids, allocate markets and fix, raise, stabilize and control prices of AFRS from at least January 2000 and through such time as the anticompetitive effects of the conduct ceased, but not before February 2014 ("AFRS Relevant Time Period").

124.   GEICO purchased or reimbursed its insureds and third-party claimants for AFRS from NGK Spark Plugs and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for

AFRS after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of AFRS from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including AFRS, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement AFRS and new Motor Vehicles containing price-fixed AFRS for its fleet program.

125.   The AFRS Conspiracy caused GEICO to pay supra-competitive prices for AFRS and Motor Vehicles and thus injured GEICO in its business.  The anticompetitive effects of NGK Spark Plugs and its co-conspirators' unlawful conduct continue to be felt.

### D. The Anti-Vibrational Rubber Parts Conspiracy

126.   "Anti-Vibrational Rubber Parts" ("AVRPs") are comprised primarily of rubber and metal, and are installed in suspension systems and engine mounts, as well as other parts of an automobile, to reduce engine and road vibration.

127.   Bridgestone, Toyo, Yamashita ("AVRP Defendants") and their co-conspirators supplied Anti-Vibrational Rubber Parts to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  The AVRP Defendants and their co-conspirators also supplied AVRPs to automotive repair professionals located in the United States.  The AVRP Defendants and their co-conspirators manufactured AVRPs (a) in the United States for installation in

53

Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

128. The AVRP Defendants conspired with other manufacturers of AVRPs to rig bids, allocate markets and fix, raise, stabilize and control prices of AVRPs from at least March 1996 and through such time as the anticompetitive effects of the conduct ceased, but not before February 2014 ("AVRPs Relevant Time Period").

129. GEICO purchased or reimbursed its insureds and third-party claimants for AVRPs from AVRP Defendants and their-co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for AVRPs after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of AVRPs from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including AVRPs, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement AVRPs and new Motor Vehicles containing price-fixed AVRPs for its fleet program.

130.   The AVRPs Conspiracy caused GEICO to pay supra-competitive prices for AVRPs and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Bridgestone, Toyo, Yamashita and their co-conspirators' unlawful conduct continue to be felt.

### E. The ATF Warmers and Oil Coolers Conspiracy

131.   "ATF Warmers" are devices located in the engine compartment of a Motor Vehicle that warm the automatic transmission fluid.  An ATF Warmer helps improve fuel efficiency reducing friction in the Motor Vehicle's transmission. "Oil Coolers" are devices located in the engine compartment of a Motor Vehicle that remove surplus heat from the engine oil.

132.   Calsonic and its co-conspirators supplied ATF Warmers and Oil Coolers to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Calsonic and its co-conspirators also supplied ATF Warmers and Oil Coolers to automotive repair professionals located in the United States.  Calsonic and its co-conspirators manufactured ATF Warmers and Oil Coolers (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor

Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

133.   Calsonic conspired with other manufacturers of ATF Warmers and Oil Coolers to rig bids, allocate markets and fix, raise, stabilize and control prices of ATF Warmers and Oil Coolers from at least November 2002 and continuing at least September 2013 ("ATF Warmers and Oil Coolers Relevant Time Period").

134.   GEICO purchased or reimbursed its insureds and third-party claimants for ATF Warmers and Oil Coolers from Calsonic and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for ATF Warmers and Oil Coolers after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of ATF Warmers and Oil Coolers from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including ATF Warmers and Oil Coolers, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement ATF Warmers and Oil Coolers and new Motor Vehicles containing price-fixed ATF Warmers and Oil Coolers for its fleet program.

135.   The ATF Warmers and Oil Coolers Conspiracy caused GEICO to pay supra-competitive prices for ATF Warmers and Oil Coolers and Motor Vehicles

and thus injured GEICO in its business. The anticompetitive effects of Calsonic and its co-conspirators' unlawful conduct continue to be felt.

### F. The Automotive Bearings Conspiracy

136.   "Automotive Bearings" or "Bearings" are devices in a Motor Vehicle used to position, hold and guide moving parts, as well as to reduce friction between moving and fixed parts.  Bearings are located throughout a Motor Vehicle. Bearings include the following devices used in Motor Vehicles: ball bearings, tapered roller bearings, roller bearings, mounted bearings, and parts and components for ball and roller bearings.

137.   Nachi, NTN, SKF, JTEKT ("Bearings Defendants") and their co-conspirators supplied Bearings to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.   The Bearings Defendants and their co-conspirators also supplied Bearings to automotive repair professionals located in the United States.  The Bearings Defendants and their co-conspirators manufactured Bearings (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

138.   The Bearings Defendants conspired with other manufacturers of Bearings to rig bids, allocate markets and fix, raise, stabilize and control prices of Bearings from at least January 2000 and continuing until at least September 2013 ("Bearings Relevant Time Period").

139.   GEICO purchased or reimbursed its insureds and third-party claimants for Bearings from Bearings Defendants and their co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Bearings after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Bearings from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Bearings, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Bearings and new Motor Vehicles containing price-fixed Bearings for its fleet program.

140.   The Bearings Conspiracy caused GEICO to pay supra-competitive prices for Bearings and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Nachi, NTN, SKF, JTEKT and their co-conspirators' unlawful conduct continue to be felt.

### G. The Automotive Brake Hoses Conspiracy

141.   "Automotive Brake Hoses" are flexible tubes used to convey liquid and air in Motor Vehicles.

142. Hitachi Metals and its co-conspirators supplied Automotive Brake Hoses to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. Hitachi Metals and its co-conspirators also supplied Automotive Brake Hoses to automotive repair professionals located in the United States. Hitachi Metals and its co-conspirators manufactured Automotive Brake Hoses (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

143. Hitachi Metals conspired with other manufacturers of Automotive Brake Hoses to rig bids, allocate markets and fix, raise, stabilize and control prices of Automotive Brake Hoses from at least May 2003 and continuing through at least October 2014 ("Automotive Brake Hoses Relevant Time Period").

144. GEICO purchased or reimbursed its insureds and third-party claimants for Automotive Brake Hoses from Hitachi Metals and its co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Automotive Brake Hoses after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for

59

their purchase of Automotive Brake Hoses from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Automotive Brake Hoses, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Automotive Brake Hoses and new Motor Vehicles containing price-fixed Automotive Brake Hoses for its fleet program.

145. The Automotive Brake Hoses Conspiracy caused GEICO to pay supra-competitive prices for Automotive Brake Hoses and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Hitachi Metals and its co-conspirators' unlawful conduct continue to be felt.

### H. The Automotive Constant-Velocity-Joint Boot Products Conspiracy

146. "Automotive Constant-Velocity-Joint Boot Products" are composed of rubber or plastic, and are used to cover the constant-velocity-joints of an automobile to protect the joints from contaminants.

147. Toyo and its co-conspirators supplied Automotive Constant-Velocity-Joint Boot Products ("ABPs") to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. Toyo and its co-conspirators also supplied ABPs to automotive repair professionals located in the United States. Toyo and its co-conspirators manufactured ABPs (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the

United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

148.   Toyo conspired with other manufacturers of ABPs to rig bids, allocate markets and fix, raise, stabilize and control prices of ABPs from at least January 2006 and continuing until at least January 2015 ("ABPs Relevant Time Period").

149.   GEICO purchased or reimbursed its insureds and third-party claimants for ABPs from Toyo and its co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for ABPs after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of ABPs from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including ABPs, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement ABPs and new Motor Vehicles containing price-fixed ABPs for its fleet program.

150.   The ABPs Conspiracy caused GEICO to pay supra-competitive prices for ABPs and Motor Vehicles and thus injured GEICO in its business.   The anticompetitive effects of Toyo and its co-conspirators' unlawful conduct continue to be felt.

### I.  The Automotive Lamps Conspiracy

151.  An "Automotive Lamp" includes headlamps and rear combination lamps installed by OEMS.  A headlamp is an Automotive Lamp installed in the front of an automobile, which consists of lights such as headlights, a clearance lamp and turn signals.  A rear combination lamp is an Automotive Lamp installed in the rear of a Motor Vehicle, which consists of lights such as a backup lamp, stop lamp, tail lights and turn signals.

152.  KOITO, MITSUBA, Stanley ("Lamps Defendants") and their co-conspirators supplied Automotive Lamps to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  The Lamps Defendants and their co-conspirators also supplied Automotive Lamps to automotive repair professionals located in the United States.  The Automotive Lamps Defendants and their co-conspirators manufactured Automotive Lamps (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

153.  The Lamps Defendants conspired with other manufacturers of Automotive Lamps to rig bids, allocate markets and fix, raise, stabilize and control

prices of Automotive Lamps from at least June 1997 and continuing until at least January 2015 ("Automotive Lamps Relevant Time Period").

154.   GEICO purchased or reimbursed its insureds and third-party claimants for Automotive Lamps from Lamps Defendants and their co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for Automotive Lamps after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Automotive Lamps from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Automotive Lamps, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement Automotive Lamps and new Motor Vehicles containing price-fixed Automotive Lamps for its fleet program.

155.   The Automotive Lamps Conspiracy caused GEICO to pay supra-competitive prices for Automotive Lamps and Motor Vehicles and thus injured GEICO in its business.   The anticompetitive effects of KOITO, MITSUBA, Stanley and their co-conspirators' unlawful conduct continue to be felt.

### J.  The Automotive Steel Tubes Conspiracy

156.   An "Automotive Steel Tube" or "Steel Tube" is used in fuel distribution, braking and other automotive systems.   Automotive Steel Tubes are sometimes divided into two categories: chassis tubes and engine parts.   Chassis

tubes, such as brake and fuel tubes, tend to be located in the body of a Motor Vehicle. Engine parts, such as fuel injection rails, oil level tubes and oil strainer tubes are associated with the function of a Motor Vehicle's engine.

157. Usui and its co-conspirators supplied Steel Tubes to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. Usui and its co-conspirators also supplied Steel Tubes to automotive repair professionals located in the United States. Usui and its co-conspirators manufactured Steel Tubes (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

158. Usui conspired with other manufacturers of Steel Tubes to rig bids, allocate markets and fix, raise, stabilize and control prices of Steel Tubes from at least December 2003 and continuing until at least November 2016 ("Steel Tubes Relevant Time Period").

159. GEICO purchased or reimbursed its insureds and third-party claimants for Steel Tubes from Usui and its co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Steel Tubes after

the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Steel Tubes from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Steel Tubes, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Steel Tubes and new Motor Vehicles containing price-fixed Steel Tubes for its fleet program.

160. The Steel Tubes Conspiracy caused GEICO to pay supra-competitive prices for Steel Tubes and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Usui and its co-conspirators' unlawful conduct continue to be felt.

### K. The Automotive Wire Harness Systems Conspiracy

161. "Automotive Wire Harness Systems" or "Wire Harnesses" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in Motor Vehicles. Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a Motor Vehicle. "Automotive Wire Harness Systems" include the following: automotive wire harnesses, speed sensor assemblies, automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, high voltage wiring, and power distributors.

162.   Chiyoda and its co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Chiyoda and its co-conspirators also supplied Wire Harnesses to automotive repair professionals located in the United States.  Chiyoda and its co-conspirators manufactured Wire Harnesses (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

163.   Chiyoda conspired with other manufacturers of Wire Harnesses to rig bids, allocate markets and fix, raise, stabilize and control prices of Wire Harnesses from at least January 1999 and continuing through at least August 2014 ("Wire Harnesses Relevant Time Period").

164.   GEICO purchased or reimbursed its insureds and third-party claimants for Wire Harnesses from Chiyoda and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Wire Harnesses after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Wire Harnesses from repair professionals; or (c) reimbursed its insureds and claimants

66

for the full value of the Motor Vehicle, including Wire Harnesses, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Wire Harnesses and new Motor Vehicles containing price-fixed Wire Harnesses for its fleet program.

165. The Wire Harnesses Conspiracy caused GEICO to pay supra-competitive prices for Wire Harnesses and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Chiyoda and its co-conspirators' unlawful conduct continue to be felt.

### L. The Body Sealings Conspiracy

166. "Body Sealings" are automotive body sealing parts, which are typically made of rubber and trim the doors, hoods and compartments of Motor Vehicles. Body Sealings keep noise, debris, rainwater and wind from entering the Motor Vehicle and control Motor Vehicle vibration. In some instances they also serve as a design element. Body Sealings include body-side opening seals, door-side weather-stripping, glass-run channels, trunk lids and other rubber sealings.

167. Nishikawa and its co-conspirators supplied Body Sealings to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. Nishikawa and its co-conspirators also supplied Body Sealings to automotive repair professionals located in the United States. Nishikawa and its co-conspirators manufactured Body Sealings (a) in the United States for installation in

Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

168.   Nishikawa conspired with other manufacturers of Body Sealings to rig bids, allocate markets and fix, raise, stabilize and control prices of Body Sealings from at least January 2000 and continuing until at least July 2016 ("Body Sealings Relevant Time Period").

169.   GEICO purchased or reimbursed its insureds and third-party claimants for Body Sealings from Nishikawa and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Body Sealings after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Body Sealings from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Body Sealings, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Body Sealings and new Motor Vehicles containing price-fixed Body Sealings for its fleet program.

170.   The Body Sealings Conspiracy caused GEICO to pay supra-competitive prices for Body Sealings and Motor Vehicles and thus injured GEICO in its business.  The anticompetitive effects of Nishikawa and its co-conspirators' unlawful conduct continue to be felt.

### M. The Ceramic Substrates Conspiracy

171.   A "Ceramic Substrate" is an uncoated ceramic monolith with a fine honeycomb structure that, after coating by third parties with a mix of metal and other chemicals, is incorporated into an automotive catalytic converter.

172.   NGK Insulators and its co-conspirators supplied Ceramic Substrates to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  NGK Insulators and its co-conspirators also supplied Ceramic Substrates to automotive repair professionals located in the United States. NGK Insulators and its co-conspirators manufactured Ceramic Substrates (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

173.   NGK Insulators conspired with other manufacturers of Ceramic Substrates to rig bids, allocate markets and fix, raise, stabilize and control prices of

Ceramic Substrates from at least July 2000 and continuing until at least September 2013 ("Ceramic Substrates Relevant Time Period").

174. GEICO purchased or reimbursed its insureds and third-party claimants for Ceramic Substrates from NGK Insulators and its co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Ceramic Substrates after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Ceramic Substrates from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Ceramic Substrates, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Ceramic Substrates and new Motor Vehicles containing price-fixed Ceramic Substrates for its fleet program.

175. The Ceramic Substrates Conspiracy caused GEICO to pay supra-competitive prices for Ceramic Substrates and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of NGK Insulators and its co-conspirators' unlawful conduct continue to be felt.

## N. The Electric Powered Steering Assemblies Conspiracy

176. "Electric Powered Steering Assemblies," which are defined to include electric power steering motors, provide electronic power to assist the driver to more easily steer the automobile. Electric Powered Steering Assemblies link the

steering wheel to the tires, and include the column, intermediate shaft and electronic control unit but do not include the steering wheel or tires. "Pinion-Assist Type Electric Powered Steering Assemblies" provide power to the steering gear pinion shaft from electric motors to assist the driver to more easily steer the automobile. Pinion-Assist Type Electric Powered Steering Assemblies include an electronic control unit and link the steering wheel to the tires, but do not include the column, intermediate shaft, steering wheel or tires. Pinion-Assist Type Electric Powered Steering Assemblies are a subset of Electric Powered Steering Assemblies. The term Electric Powered Steering Assemblies, as used in this Complaint, includes Pinion-Assist Type Electric Powered Steering Assemblies as well as all component parts of the assemblies, including the steering column, intermediate shaft, electronic control unit and electric power steering motors but not the steering wheel or tires.

177. JTEKT, MITSUBA, Yamada and their co-conspirators supplied Electric Powered Steering Assemblies to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. JTEKT, MITSUBA, Yamada and their co-conspirators also supplied Electric Powered Steering Assemblies to automotive repair professionals located in the United States. JTEKT, MITSUBA, Yamada and their co-conspirators manufactured Electric Powered Steering Assemblies (a) in the United States for installation in Motor

71

Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

178.   JTEKT MITSUBA and Yamada conspired with other manufacturers of Electric Powered Steering Assemblies to rig bids, allocate markets and fix, raise, stabilize and control prices of Electric Powered Steering Assemblies from at least January 2005 and continuing until at least September 2013 ("Electric Powered Steering Assemblies Relevant Time Period").

179.   GEICO purchased or reimbursed its insureds and third-party claimants for Electric Powered Steering Assemblies from JTEKT, MITSUBA, Yamada and their co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Electric Powered Steering Assemblies after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Electric Powered Steering Assemblies from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Electric Powered Steering Assemblies, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Electric Powered Steering Assemblies and new Motor

Vehicles containing price-fixed Electric Powered Steering Assemblies for its fleet program.

180. The Electric Powered Steering Assemblies Conspiracy caused GEICO to pay supra-competitive prices for Electric Powered Steering Assemblies and thus injured GEICO in its business. The anticompetitive effects of JTEKT, MITSUBA, Yamada and their co-conspirators' unlawful conduct continue to be felt.

### O. The Exhaust Systems Conspiracy

181. An "Exhaust System," is a system of piping and other parts that conveys noxious exhaust gases away from the passenger compartment and reduces the level of pollutants and engine exhaust noise emitted. An Exhaust System includes one or more of the following components: manifold, flex pipes, catalytic converter, oxygen sensor, isolator/gasket/clamps, resonator assemblies/pipe accessories and muffler/muffler assemblies. An Exhaust System has a "hot end," which is the part of the Exhaust System that is mounted to the engine which is generally comprised of a manifold and catalytic converter, and a "cold end," which is the part of the Exhaust System that is mounted to the underbody of the car which generally contains a muffler, pipes and possibly a catalytic converter. In some instances, the component parts of an Exhaust System are sourced separately while in other instances they are sourced together.

182.   Faurecia, Tenneco, Eberspächer ("Exhaust System Defendants") and their co-conspirators supplied Exhaust Systems to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  The Exhaust System Defendants and their co-conspirators also supplied Exhaust Systems to automotive repair professionals located in the United States.  The Exhaust System Defendants and their co-conspirators manufactured Exhaust Systems (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

183.   The Exhaust System Defendants conspired with other manufacturers of Exhaust Systems to rig bids, allocate markets and fix, raise, stabilize and control prices of Exhaust Systems from at least January 2002 and continuing through at least March 2014 ("Exhaust Systems Relevant Time Period").

184.   GEICO purchased or reimbursed its insureds and third-party claimants for Exhaust Systems from Exhaust Defendants or their co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Exhaust Systems after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of

Exhaust Systems from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Exhaust Systems, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Exhaust Systems and new Motor Vehicles containing price-fixed Exhaust Systems for its fleet program.

185.  The Exhaust Systems Conspiracy caused GEICO to pay supra-competitive prices for Exhaust Systems and Motor Vehicles and thus injured GEICO in its business.  The anticompetitive effects of Faurecia, Tenneco, Eberspächer and their co-conspirators' unlawful conduct continue to be felt.

### P. The Fan Motors Conspiracy

186.  "Fan Motors" are small electric motors used to turn radiator cooling fans.

187.  MITSUBA and its co-conspirators supplied Fan Motors to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  MITSUBA and its co-conspirators also supplied Fan Motors to automotive repair professionals located in the United States.  MITSUBA and its co-conspirators manufactured Fan Motors (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere

for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

188.  MITSUBA conspired with other manufacturers of Fan Motors to rig bids, allocate markets and fix, raise, stabilize and control prices of Fan Motors from at least January 2000 and continuing at least until September 2013 ("Fan Motors Relevant Time Period").

189.  GEICO purchased or reimbursed its insureds and third-party claimants for Fan Motors from MITSUBA and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Fan Motors after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Fan Motors from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Fan Motors, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Fan Motors and new Motor Vehicles containing price-fixed Fan Motors for its fleet program.

190.  The Fan Motors Conspiracy caused GEICO to pay supra-competitive prices for Fan Motors and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of MITSUBA and its co-conspirators' unlawful conduct continue to be felt.

## Q. The Fuel Injection Systems Conspiracy

191.  "Fuel Injection Systems" admit fuel or a fuel/air mixture into engine cylinders and may include injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, airflow meters, engine electronic control units, fuel pumps, fuel pump modules, manifold absolute pressure sensors, pressure regulators, pulsation dampers, purge control valves and other components sold as a unitary system.  In some instances, the component parts of a Fuel Injection System are sourced separately while in other instances they are sourced together. Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system.

192.  Aisan, Bosch, MITSUBA ("Fuel Injection Defendants") and their co-conspirators supplied Fuel Injection Systems to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  The Fuel Injection Defendants and their co-conspirators also supplied Fuel Injection Systems to automotive repair professionals located in the United States.  The Fuel Injection Defendants and their co-conspirators manufactured Fuel Injection Systems (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor

Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

193.   The Fuel Injection Defendants conspired with other manufacturers of Fuel Injection Systems to rig bids, allocate markets and fix, raise, stabilize and control prices of Fuel Injection Systems from at least January 2002 and continuing through at least March 2015 ("Exhaust Systems Relevant Time Period").

194.   GEICO purchased or reimbursed its insureds and third-party claimants for Fuel Injection Systems from Fuel Injection Defendants and their co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Fuel Injection Systems after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Fuel Injection Systems from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Fuel Injection Systems, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Fuel Injection Systems and new Motor Vehicles containing price-fixed Fuel Injection Systems for its fleet program.

195.   The Fuel Injection Systems Conspiracy caused GEICO to pay supra-competitive prices for Fuel Injection Systems and Motor Vehicles and thus injured GEICO in its business.  The anticompetitive effects of Aisan, Bosch, MITSUBA and their co-conspirators' unlawful conduct continue to be felt.

### R. The Heater Control Panels Conspiracy

196.   "Heater Control Panels" ("HCPs") are located in the center console, back seat, or rear cabin of an automobile and control the temperature of the interior environment of a Motor Vehicle.   Heater Control Panels are either mechanical or electrical.   Electrical Heater Control Panels are either manual (referred to as low-grade) or automatic (referred to as high-grade); Heater Control Panels may also be referred to as mid-grade or super-high grade.

197.   Alps and its co-conspirators supplied Heater Control Panels to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.   Alps and its co-conspirators also supplied HCPs to automotive repair professionals located in the United States.   Alps and its co-conspirators manufactured HCPs (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

198.   Alps conspired with other manufacturers of HCPs to rig bids, allocate markets and fix, raise, stabilize and control prices of HCPs from at least January

2000 and continuing through at least January 2012 ("HCPs Relevant Time Period").

199.   GEICO purchased or reimbursed its insureds and third-party claimants for HCPs from Alps and its co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for HCPs after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of HCPs from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including HCPs, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement HCPs and new Motor Vehicles containing price-fixed HCPs for its fleet program.

200.   The HCPs Conspiracy caused GEICO to pay supra-competitive prices for HCPs and Motor Vehicles and thus injured GEICO in its business.   The anticompetitive effects of Alps and its co-conspirators' unlawful conduct continue to be felt.

### S.   *The High Intensity Discharge Ballasts Conspiracy*

201.   "High Intensity Discharge Ballasts" or "HID Ballasts" provide the initial voltage needed to start and maintain light discharged from automobile headlamps.   HID Ballasts further serve to limit the amount of electrical current flowing to an HID headlamp, which would otherwise rise to destructive levels due

to the HID headlamp's negative resistance. HID Ballasts are one component part of a car's headlamp system; they are generally only installed in premium Motor Vehicle models. The sourcing for HID Ballasts sometimes occurs in multiple parts. Some OEMs require the manufacturer to assemble and deliver the entire HID system to the OEM. In other cases, the OEM may supply the ballast itself to the headlamp manufacturer, or purchase the ballast for assembly by the manufacturer from another supplier. Alternatively, the OEM may select a ballast supplier, negotiate the ballast price, and then direct the HID system manufacturer to purchase ballasts from the selected supplier at a price negotiated by the OEM.

202. KOITO, Stanley and their co-conspirators supplied HID Ballasts to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. KOITO, Stanley and their co-conspirators also supplied HID Ballasts to automotive repair professionals located in the United States. KOITO, Stanley and their co-conspirators manufactured HID Ballasts (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

203.   KOITO and Stanley conspired with other manufacturers of HID Ballasts to rig bids, allocate markets and fix, raise, stabilize and control prices of HID Ballasts from at least July 1998 and continuing through at least January 2014 ("HID Ballasts Relevant Time Period").

204.   GEICO purchased or reimbursed its insureds and third-party claimants for HID Ballasts from KOITO, Stanley and their co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for HID Ballasts after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of HID Ballasts from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including HID Ballasts, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement HID Ballasts and new Motor Vehicles containing price-fixed HID Ballasts for its fleet program.

205.   The HID Ballasts Conspiracy caused GEICO to pay supra-competitive prices for HID Ballasts and Motor Vehicles and thus injured GEICO in its business.   The anticompetitive effects of KOITO, Stanley and their co-conspirators' unlawful conduct continue to be felt.

### T. The Ignition Coils Conspiracy

206.   "Ignition Coils" are part of the fuel ignition system of an automobile and release electric energy suddenly to ignite a fuel mixture.

207.   Diamond Electric and its co-conspirators supplied Ignition Coils to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Diamond Electric and its co-conspirators also supplied Ignition Coils to automotive repair professionals located in the United States. Diamond Electric and its co-conspirators manufactured Ignition Coils (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

208.   Diamond Electric conspired with other manufacturers of Ignition Coils to rig bids, allocate markets and fix, raise, stabilize and control prices of Ignition Coils from at least January 2000 and continuing until at least July 2013 ("Ignition Coils Relevant Time Period").

209.   GEICO purchased or reimbursed its insureds and third-party claimants for Ignition Coils from Diamond Electric and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for

Ignition Coils after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Ignition Coils from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Ignition Coils, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Ignition Coils and new Motor Vehicles containing price-fixed Ignition Coils for its fleet program.

210.   The Ignition Coils Conspiracy caused GEICO to pay supra-competitive prices for Ignition Coils and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Diamond Electric and its co-conspirators' unlawful conduct continue to be felt.

### U. The Instrument Panel Clusters Conspiracy

211.   "Instrument Panel Clusters" ("IPCs") also known as "Meters," are the mounted array of instruments and gauges housed in front of the driver of an automobile.  Instrument Panel Clusters can be digital, analog or hybrid.  Instrument Panel Clusters are highly specialized Auto Parts and are generally sold as a complete unit, rather than purchased as individual component parts.

212.   Continental and its co-conspirators supplied Instrument Panel Clusters to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Continental and its co-conspirators also supplied IPCs to automotive repair professionals located in the United States.  Continental and its

co-conspirators manufactured IPCs (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

213.   Continental conspired with other manufacturers of IPCs to rig bids, allocate markets and fix, raise, stabilize and control prices of IPCs from at least January 1999 and continuing until at least May 2012 ("IPCs Relevant Time Period").

214.   GEICO purchased or reimbursed its insureds and third-party claimants for IPCs from Continental or its co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for IPCs after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of IPCs from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including IPCs, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement IPCs and new Motor Vehicles containing price-fixed IPCs for its fleet program.

215.   The IPCs Conspiracy caused GEICO to pay supra-competitive prices for IPCs and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Continental and its co-conspirators' unlawful conduct continue to be felt.

## V. The Interior Trim Products Conspiracy

216.   "Interior Trim Products," are automotive plastic interior trim parts. They typically consist of molded trim parts made from plastics, polymers, elastomers and/or resins manufactured and/or sold for installation in automobile interiors, including, without limitation, console boxes, assist grips, registers, center cluster panels, glove boxes and glove box doors, meter cluster hoods, switch hole covers and lower panel covers and boxes.  Interior Trim Products do not include the main bodies of instrument panels.

217.   INOAC and its co-conspirators supplied Interior Trim Products to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  INOAC and its co-conspirators also supplied Interior Trim Products to automotive repair professionals located in the United States.  INOAC and its co-conspirators manufactured Interior Trim Products (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States;

86

and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

218. INOAC conspired with other manufacturers of Interior Trim Products to rig bids, allocate markets and fix, raise, stabilize and control prices of Interior Trim Products from at least June 2004 and continuing through at least March 2012 ("Interior Trim Products Time Period").

219. GEICO purchased or reimbursed its insureds and third-party claimants for Interior Trim Products from INOAC and its co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Interior Trim Products after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Interior Trim Products from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Interior Trim Products, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Interior Trim Products and new Motor Vehicles containing price-fixed Interior Trim Products for its fleet program.

220. The Interior Trim Products Conspiracy caused GEICO to pay supra-competitive prices for Interior Trim Products and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of INOAC and its co-conspirators' unlawful conduct continue to be felt.

87

## W. The Power Window Motors Conspiracy

221.   "Power Window Motors" are small electric motors used to raise and lower Motor Vehicle windows.

222.   MITSUBA and its co-conspirators supplied Power Window Motors to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  MITSUBA and its co-conspirators also supplied Power Window Motors to automotive repair professionals located in the United States. MITSUBA and its co-conspirators manufactured Power Window Motors (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

223.   MITSUBA conspired with other manufacturers of Power Window Motors to rig bids, allocate markets and fix, raise, stabilize and control prices of Power Window Motors from at least January 2000 and continuing until at least September 2013 ("Power Window Motors Relevant Time Period").

224.   GEICO purchased or reimbursed its insureds and third-party claimants for Power Window Motors from MITSUBA and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals

88

for Power Window Motors after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Power Window Motors from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Power Window Motors, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Power Window Motors and new Motor Vehicles containing price-fixed Power Window Motors for its fleet program.

225. The Power Window Motors Conspiracy caused GEICO to pay supra-competitive prices for Power Window Motors and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of MITSUBA and its co-conspirators' unlawful conduct continue to be felt.

### X. The Radiators Conspiracy

226. "Radiators" are devices that help to prevent Motor Vehicles from overheating and are located in the engine compartment of a Motor Vehicle and include radiator fans. Radiators are a form of heat exchanger, usually filled with a combination of water and antifreeze, which extracts heat from inside the engine block. The radiator indirectly exposes coolant, heated by traveling through the engine block, to cool air as the Motor Vehicle moves. Radiators are replaced when a Motor Vehicle consistently overheats.

227.   Calsonic, MITSUBA and their co-conspirators supplied Radiators to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Calsonic, MITSUBA and their co-conspirators also supplied Radiators to automotive repair professionals located in the United States. Calsonic, MITSUBA and their co-conspirators manufactured Radiators (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

228.   Calsonic and MITSUBA conspired with other manufacturers of Radiators to rig bids, allocate markets and fix, raise, stabilize and control prices of Radiators from at least January 2000 and continuing until at least September 2013 ("Radiators Relevant Time Period").

229.   GEICO purchased or reimbursed its insureds and third-party claimants for Radiators from Calsonic, MITSUBA and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Radiators after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Radiators from repair professionals; or (c) reimbursed its insureds and claimants for the full

value of the Motor Vehicle, including Radiators, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Radiators and new Motor Vehicles containing price-fixed Radiators for its fleet program.

230.   The Radiators Conspiracy caused GEICO to pay supra-competitive prices for Radiators and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Calsonic, MITSUBA and their co-conspirators' unlawful conduct continue to be felt.

### Y. *The Shock Absorbers Conspiracy*

231.   "Shock Absorbers," are part of the Motor Vehicle's suspension system and absorb and  dissipate energy to help cushion Motor Vehicles on uneven roads leading to improved ride quality and Motor Vehicle handling.  Shock Absorbers are also called "dampers."

232.   HIAMS and its co-conspirators supplied Shock Absorbers to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  HIAMS and its co-conspirators also supplied Shock Absorbers to automotive repair professionals located in the United States.  HIAMS and its co-conspirators manufactured Shock Absorbers (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere

91

for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

233.   HIAMS conspired with other manufacturers of Shock Absorbers to rig bids, allocate markets and fix, raise, stabilize and control prices of Shock Absorbers from at least January 1995 and through such time as the anticompetitive effects of HIAMS and its co-conspirators' conduct ceased, but no earlier than August 2016 ("Shock Absorbers Relevant Time Period").

234.   GEICO purchased or reimbursed its insureds and third-party claimants for Shock Absorbers from HIAMS and its co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for Shock Absorbers after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Shock Absorbers from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Shock Absorbers, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement Shock Absorbers and new Motor Vehicles containing price-fixed Shock Absorbers for its fleet program.

235.  The Shock Absorbers Conspiracy caused GEICO to pay supra-competitive prices for Shock Absorbers and Motor Vehicles and thus injured

GEICO in its business. The anticompetitive effects of HIAMS and its co-conspirators' unlawful conduct continue to be felt.

### Z. The Side Door Latches and Latch Minimodules Conspiracy

236. Automotive "Side Door Latches" serve to secure an automotive door to a Motor Vehicle body and may be locked to prevent unauthorized access to a Motor Vehicle. A "Latch Minimodule" includes the Side Door Latch and all of the related mechanical operating components, including the electric lock function.

237. Kiekert and its co-conspirators supplied Side Door Latches and Latch Minimodules to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. Kiekert and its co-conspirators also supplied Side Door Latches and Latch Minimodules to automotive repair professionals located in the United States. Kiekert and its co-conspirators manufactured Side Door Latches (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

238. Kiekert conspired with other manufacturers of Side Door Latches and Latch Minimodules to rig bids, allocate markets and fix, raise, stabilize and control prices of Side Door Latches and Latch Minimodules from at least September 2008

and continuing through at least March 2017 ("Side Door Latches Relevant Time Period").

239.   GEICO purchased or reimbursed its insureds and third-party claimants for Side Door Latches from Kiekert and its co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for Side Door Latches after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Side Door Latches from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Side Door Latches, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement Side Door Latches and Latch Minimodules and new Motor Vehicles containing price-fixed latches for its fleet program.

240.   The Side Door Latches Conspiracy caused GEICO to pay supra-competitive prices for Side Door Latches, Latch Minimodules and Motor Vehicles and thus injured GEICO in its business.   The anticompetitive effects of Kiekert and its co-conspirators' unlawful conduct continue to be felt.

### AA.   The Spark Plugs Conspiracy

241.   "Spark Plugs" are located in the engine and deliver high electric voltage from the ignition system to the combustion chamber of an internal

combustion engine.  Spark Plugs come in three varieties:  nickel, platinum and iridium.

242.   Bosch, NGK Spark Plugs and their co-conspirators supplied Spark Plugs to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Bosch, NGK Spark Plugs and their co-conspirators also supplied Spark Plugs to automotive repair professionals located in the United States.  Bosch, NGK Spark Plugs and their co-conspirators manufactured Spark Plugs (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

243.   Bosch and NGK Spark Plugs conspired with other manufacturers of Spark Plugs to rig bids, allocate markets and fix, raise, stabilize and control prices of Spark Plugs from at least January 2000 and continuing until at least March 2015 ("Spark Plugs Relevant Time Period").

244.   GEICO purchased or reimbursed its insureds and third-party claimants for Spark Plugs from Bosch, NGK Spark Plugs and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Spark Plugs after the repair professional repaired its insureds or claimants'

Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Spark Plugs from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Spark Plugs, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Spark Plugs and new Motor Vehicles containing price-fixed Spark Plugs for its fleet program.

245.   The Spark Plugs Conspiracy caused GEICO to pay supra-competitive prices for Spark Plugs and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Bosch, NGK Spark Plugs and their co-conspirators' unlawful conduct continue to be felt.

### BB.   The Standard Oxygen Sensors Conspiracy

246.   "Standard Oxygen Sensors" are located in the exhaust system and measure the amount of oxygen in the exhaust.

247.   NGK Spark Plugs and their co-conspirators supplied Standard Oxygen Sensors to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. NGK Spark Plugs and its co-conspirators also supplied Standard Oxygen Sensors to automotive repair professionals located in the United States. NGK Spark Plugs and its co-conspirators manufactured Standard Oxygen Sensors (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles

96

manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

248.  NGK Spark  Plugs conspired with other manufacturers of Standard Oxygen Sensors to rig bids, allocate markets and fix, raise, stabilize and control prices of Standard Oxygen Sensors from at least January 2000 and continuing until at least March 2015 ("Standard Oxygen Sensors Relevant Time Period").

249.  GEICO purchased or reimbursed its insureds and third-party claimants for Standard Oxygen Sensors from NGK Spark Plugs and its co-conspirators in all fifty states throughout the United States.   GEICO (a) directly paid repair professionals for Standard Oxygen Sensors after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Standard Oxygen Sensors from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Standard Oxygen Sensors, when the Motor Vehicle was declared a total loss.   GEICO also purchased replacement Standard Oxygen Sensors and new Motor Vehicles containing price-fixed Standard Oxygen Sensors for its fleet program.

250.  The Standard Oxygen Sensors Conspiracy caused GEICO to pay supra-competitive prices for Standard Oxygen Sensors and Motor Vehicles and

thus injured GEICO in its business.  The anticompetitive effects of NGK Spark Plugs and its co-conspirators' unlawful conduct continue to be felt.

### CC.   The Starters Conspiracy

251.  "Starters" or "Starter Motors" are devices that power a Motor Vehicle's battery to "turn over" and start when the driver turns the ignition switch. When a Starter is damaged, a Motor Vehicle will not turn on.

252.  Bosch, MITSUBA and their co-conspirators supplied Starters to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere.  Bosch, MITSUBA and their co-conspirators also supplied Starters to automotive repair professionals located in the United States.  Bosch, MITSUBA and their co-conspirators manufactured Starters (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

253.  Bosch and MITSUBA conspired with other manufacturers of Starters to rig bids, allocate markets and fix, raise, stabilize and control prices of Starters from at least January 2000 and continuing until at least March 2015 ("Starters Relevant Time Period").

98

254.   GEICO purchased or reimbursed its insureds and third-party claimants for Starters from Bosch, MITSUBA and its co-conspirators in all fifty states throughout the United States.  GEICO (a) directly paid repair professionals for Starters after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Starters from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Starters, when the Motor Vehicle was declared a total loss.  GEICO also purchased replacement Starters and new Motor Vehicles containing price-fixed Starters for its fleet program.

255.   The Starters Conspiracy caused GEICO to pay supra-competitive prices for Starters and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Bosch, MITSUBA and their co-conspirators' unlawful conduct continue to be felt.

### DD.   The Windshield Washer Systems Conspiracy

256.   "Windshield Washer Systems," whether sold together or separately, are defined to include one or more of the following: the pump, hoses, nozzle and tank necessary to deliver washer fluid to Motor Vehicle windows.  Windshield Washer Systems are operated through the manipulation of a switch, which sprays cleaning solution onto the windshield of the Motor Vehicle. Windshield Washer Systems are installed at the front and sometimes rear of the Motor Vehicle.

257. MITSUBA and its co-conspirators supplied Windshield Washer Systems to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. MITSUBA and its co-conspirators also supplied Windshield Washer Systems to automotive repair professionals located in the United States. MITSUBA and its co-conspirators manufactured Windshield Washer Systems (a) in the United States for installation in Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

258. MITSUBA conspired with other manufacturers of Windshield Washer Systems to rig bids, allocate markets and fix, raise, stabilize and control prices of Windshield Washer Systems from at least January 2000 and continuing until at least September 2013 ("Windshield Washer Systems Relevant Time Period").

259. GEICO purchased or reimbursed its insureds and third-party claimants for Windshield Washer Systems from MITSUBA and its co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Windshield Washer Systems after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their

purchase of Windshield Washer Systems from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Windshield Washer Systems, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Windshield Washer Systems and new Motor Vehicles containing price-fixed Windshield Washer Systems for its fleet program.

260. The Windshield Washer Systems Conspiracy caused GEICO to pay supra-competitive prices for Windshield Washer Systems and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of MITSUBA and its co-conspirators' unlawful conduct continue to be felt.

### EE.   The Windshield Wiper Systems Conspiracy

261. "Windshield Wiper Systems," whether sold together or separately, include one or more of the following: the motor, linkage, arm and blade necessary to clear water or snow from Motor Vehicle windows.

262. Bosch, MITSUBA and their co-conspirators supplied Windshield Wiper Systems to OEMs for installation in Motor Vehicles manufactured and sold in the United States and elsewhere. Bosch, MITSUBA and their co-conspirators also supplied Windshield Wiper Systems to automotive repair professionals located in the United States. Bosch, MITSUBA and their co-conspirators manufactured Windshield Wiper Systems (a) in the United States for installation in

Motor Vehicles manufactured, sold or repaired in the United States; (b) in Japan and elsewhere for export to the United States and for installation in Motor Vehicles manufactured, sold or repaired in the United States; and (c) in Japan and elsewhere for installation in Motor Vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

263. Bosch and MITSUBA conspired with other manufacturers of Windshield Wiper Systems to rig bids, allocate markets and fix, raise, stabilize and control prices of Windshield Wiper Systems from at least January 2000 and continuing until at least March 2015 ("Windshield Wiper Systems Relevant Time Period").

264. GEICO purchased or reimbursed its insureds and third-party claimants for Windshield Wiper Systems from Bosch, MITSUBA and their co-conspirators in all fifty states throughout the United States. GEICO (a) directly paid repair professionals for Windshield Wiper Systems after the repair professional repaired its insureds or claimants' Motor Vehicles; (b) reimbursed its insureds or claimants for their purchase of Windshield Wiper Systems from repair professionals; or (c) reimbursed its insureds and claimants for the full value of the Motor Vehicle, including Windshield Wiper Systems, when the Motor Vehicle was declared a total loss. GEICO also purchased replacement Windshield Wiper Systems and new

Motor Vehicles containing price-fixed Windshield Wiper Systems for its fleet program.

265. The Windshield Wiper Systems Conspiracy caused GEICO to pay supra-competitive prices for Windshield Wiper and Motor Vehicles and thus injured GEICO in its business. The anticompetitive effects of Bosch, MITSUBA and their co-conspirators' unlawful conduct continue to be felt.

266. The Access Mechanisms Relevant Time Period, Air Conditioning Systems Relevant Time Period, Air Fuel Ratio Sensors Relevant Time Period, Anti-Vibrational Rubber Parts Relevant Time Period, ATF Warmers and Oil Coolers Relevant Time Period, Automotive Bearings Relevant Time Period, Automotive Brake Hoses Relevant Time Period, Automotive Lamps Relevant Time Period, Automotive Steel Tubes Relevant Time Period, Automotive Wire Harness Systems Relevant Time Period, Body Sealings Relevant Time Period, Ceramic Substrates Relevant Time Period, Electric Powered Steering Assemblies Relevant Time Period, Exhaust Systems Relevant Time Period, Fan Motors Relevant Time Period, Fuel Injection Systems Relevant Time Period, Heater Control Panels Relevant Time Period, HID Ballasts Relevant Time Period, Ignition Coils Relevant Time Period, Instrument Panel Clusters Relevant Time Period, Interior Trim Products Relevant Time Period, Power Window Motors Relevant Time Period, Radiators Relevant Time Period, Shock Absorbers Relevant Time

103

Period, Side Door Latches Relevant Time Period, Spark Plugs Relevant Time Period, Standard Oxygen Sensors Relevant Time Period, Starters Relevant Time Period, Windshield Washer Systems Relevant Time Period, and Windshield Wiper Systems Relevant Time Period are collectively referred to as the "Relevant Time Periods."

## II.   Governments Around the World Have Initiated Investigations into the Auto Parts Conspiracies

### A.   *Global Government Investigations into Price-Fixing in the Auto Parts Industry*

267.   The United States, Europe, Canada and Japan have coordinated their antitrust investigations of suppliers of Auto Parts.

268.   On February 23, 2010, the FBI executed search warrants and raided the offices of Yazaki North America, DENSO and Tokai Rika in the Detroit area. At this time, the FBI did not disclose the "substance or reason behind the warrants." The DOJ, however, issued a general statement that it was "investigating the possibility of anticompetitive cartel conduct of automotive electronic components suppliers" but provided no further detail. The Japan Fair Trade Commission similarly searched the offices of several Auto Parts manufacturers.

269.   Parallel raids were conducted simultaneously with Europe and Japan as part of a coordinated international operation. On February 24, 2010, the European Commission executed surprise raids at the European offices of certain

Automotive Wire Harness manufacturers.  The EC also confirmed that it had initiated investigations into other electronic and electrical distribution systems.

270.  On September 29, 2011, the U.S. Department of Justice filed the first criminal charges against Furukawa Electric Co. Ltd and three executives for their role in a conspiracy to rig bids and fix prices for Automotive Wire Harnesses.  The U.S. Department of Justice also announced that nine companies and two executives had agreed to plead guilty and to pay a total of more than $750 million in criminal fines.

271.  The scope and magnitude of the Auto Parts investigations slowly have expanded and became public, as DOJ continues to announce the automotive manufacturer firms and executives who have plead guilty to conspiracies to fix the prices and/or rig bids of specific Auto Parts.  As Scott D. Hammond, former Assistant Attorney General of DOJ's Antitrust Division's Criminal Enforcement Program, explained in September 2013, the DOJ "ha[s] seen a pattern during the course of this investigation.  The detection of one auto part conspiracy has led to the discovery of other conspiracies involving a new set of products, a new group of conspirators and a new list of victims."

### B.    *Criminal Pleadings in the Auto Parts Industry*

272.  On January 30, 2012, the DOJ announced DENSO Corporation, Yazaki Corporation and four executives had agreed to plead guilty and pay fines

105

for its involvement in multiple price-fixing and bid-rigging conspiracies in the sale of Auto Parts in the United States.  Yazaki agreed to pay a $470 million criminal fine—the second largest criminal fine for a Sherman Act violation—for its conspiracies to rig bids for and fix, stabilize and maintain the prices of Automotive Wire Harnesses, Instrument Panel Clusters and Fuel Senders.   DENSO Corporation agreed to plead guilty and pay fines for its involvement in big-rigging and price-fixing conspiracies for Electronic Control Units and Heater Control Panels.  Four months later, on April 23, 2012, the DOJ announced that another manufacturer, Fujikura Ltd., agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to fix prices for Wire Harnesses and related products.  Furukawa Electric Co. Ltd. and G.S. Electech, Inc. also pled guilty for their participation in the Wire Harness Conspiracy.

273.  On October 30, 2012, the DOJ announced that Tokai Rika agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to fix prices of Heater Control Panels installed in cars sold in the United States. DENSO

274.  On November 22, 2012, the Japan Fair Trade Commission ("JFTC") issued fines totaling $41.3 million against various Auto Parts manufacturers, including a $2.04 million fine against Defendant Calsonic, for violating antitrust laws by forming a cartel to fix prices of certain Auto Parts, including Radiators.

106

On November 22, 2012, the JFTC issued cease and desist orders and surcharge payment orders to Auto Parts manufacturers, including Calsonic. The JFTC found Calsonic and its co-conspirators conspired in procurements of automotive generators, automotive starters, automotive windshield wiper systems, and automotive radiators and electrical fans. Calsonic was fined 198,660,000 yen, or approximately $2,406,065.

275. In November 2012, the JFTC issued cease and desist and surcharge payment orders to Defendant Calsonic for its role in a conspiracy to restrain competition for Radiators and electronic fans "by designating successful bidders and managing to have the designated successful bidders win the biddings." The Commission ordered Calsonic to pay a surcharge payment of 198,660,000 yen, or approximately $1.8 million dollars, due to their role in the conspiracies.

276. On March 21, 2013, the JFTC concluded that Koito Manufacturing Co. Ltd., Ichikoh Industries Ltd. and Stanley Electric Co. Ltd. rigged the bidding process for supply contracts with automakers, including Toyota Corp., Nissan Motor Co. Ltd., Fuji Heavy Industries Ltd., Mitsubishi Motor Corp. and Mazda Motor Corp., by preordaining the winners and losers. Koito was fined $36 million, while Ichikoh was fined $13.1 million. Stanley, though involved in the collusion, escaped with no fines. The parts at issue included headlights, clearance lamps, backup lamps, tail lights, stop lamps and turn signals.

107

277.   On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co., Ltd. agreed to plead guilty and to pay a criminal fine of $19 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of, Ignition Coils sold to automobile manufacturers, including Ford Motor Company, which is headquartered in the United States, as well as Toyota, Fuji Heavy Industries, and certain of their subsidiaries, in the United States and elsewhere.

278.   On September 26, 2013, the DOJ announced that Valeo Japan Co., Ltd.[2] agreed to plead guilty and pay a $13.6 million criminal fine for its role in a conspiracy to fix prices of certain Air Conditioning Systems and related components sold to Nissan North America, Inc., Suzuki Motor Corporation, and Fuji Heavy Industries Ltd., in the United States and elsewhere.

279.   On September 26, 2013, the DOJ announced that Yamashita had agreed to plead guilty and pay an $11 million dollar criminal fine for its role in a conspiracy to fix prices and rig bids of automotive anti-vibration rubber parts sold in the United States and elsewhere.

---

[2] Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Saitama, Japan.  It is a subsidiary of and wholly controlled by Valeo S.A.

280.   On September 26, 2013, the DOJ announced that JTEKT Corporation agreed to plead guilty to a two-count information and to pay a criminal fine of $103.27 million for participating in a conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to allocate markets rig bids for, and to fix, stabilize, and maintain the prices of (1) Bearings sold to Toyota Motor Corporation, certain of its subsidiaries, and other Japanese automobile manufacturers and Japanese automobile component manufacturers in the United States and elsewhere, from at least as early as 2000 and continuing until at least July 2011 and (2) Electric Powered Steering Assemblies sold to Nissan Motor Company Ltd. and certain of its subsidiaries in the United States and elsewhere.

281. On November 6, 2013, the DOJ announced that MITSUBA Corporation agreed to pay a $135 million criminal fine and to plead guilty to a two-count criminal information charging it with obstruction of justice and participating in a combination and conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Radiators, Fan Motors, Windshield Washer Systems, Starters, Fuel Injection Systems, Windshield Wiper Systems, Electric Powered Steering Assemblies, Power Window Motors, and Automotive Lamps among other Auto Parts, sold to automobile manufacturers, including, Chrysler, Honda, Subaru, Nissan and Toyota, in the United States and elsewhere.

109

282.   On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co., Ltd. pled guilty to a two-count criminal Information for violations of Section 1 of the Sherman Act and agreed to pay a $120 million fine for its unlawful conduct in: (i) conspiring with others to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of, Anti-Vibrational Rubber Parts sold to automobile and component manufacturers in the United States and elsewhere from at least March 1996 and (ii) conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, and to fix, raise, and maintain the prices of Automotive Constant-Velocity-Joint Boot Products sold to GKN plc and its subsidiaries in the United States and elsewhere.

283.   On November 27, 2013, the DOJ announced that Stanley Electric Co., Ltd. agreed to plead guilty to a one-count criminal Information and to pay a $1.44 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, HID Ballasts sold to automobile manufacturers in the United States and elsewhere.

284.   On January 16, 2014, the DOJ announced that Koito Manufacturing Co., Ltd. agreed to plead guilty to a two-count criminal Information and to pay a $56.6 million fine for participating in a combination and conspiracy to suppress

and eliminate competition in the Auto Parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automobile lighting fixtures and HID Ballasts sold to automobile manufacturers in the United States and elsewhere.

285.   On February 3, 2014,  the DOJ announced that Aisan Industry Co., Ltd. agreed to plead guilty to a one count criminal Information and to pay a $6.86 million fine for its unlawful participation in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Electronic Throttle Bodies sold to Nissan Motor Co., Ltd. and certain of its subsidiaries in the United States and elsewhere.

286.   On February 13, 2014, the DOJ announced that Bridgestone agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive Anti-Vibrational Rubber Parts installed in cars sold in the United States and elsewhere.  On April 16, 2014, a former Bridgestone executive, agreed to plead guilty and to serve 18 months in a U.S. prison for his role in an international conspiracy to fix prices and rig bids of automotive Anti-Vibrational Rubber Parts sold in the United States and elsewhere.

287.   On March 25, 2014, the EC conducted an unannounced raid on Tenneco's Edenkoben, Germany administrative facility.  On the same day, the EC conducted unannounced raids on Eberspächer and Faurecia's facilities.  Faurecia

111

later confirmed that the investigations related to suppliers of Exhaust Systems. Tenneco, Eberspächer and Faurecia each noted in separate statements that their respective companies were cooperating in the EC's investigation.  On November 27, 2014, the Competition Commission of South Africa ("CCSA") announced that it filed a complaint against several of the Defendants and their coconspirators for price fixing, market allocation and big rigging in the market for Exhaust Systems. The CCSA specifically named, among others, Eberspächer Exhaust Gmbh & Co KG and Faurecia Corporation.

288.  On August 19, 2014, the DOJ announced that NGK Spark Plugs agreed to plead guilty for its role in a conspiracy to fix prices and rig bids for Spark Plugs, Standard Oxygen Sensors and Air Fuel Ratio Sensors installed in cars and sold to automobile manufacturers in the United States and elsewhere.  NGK Spark Plugs agreed to pay a $52.1 million dollar criminal fine as part of the plea agreement.

289.  On October 31, 2014, the DOJ announced that Hitachi Metals agreed to plead guilty and pay a $1.25 million criminal fine for its role in a conspiracy to fix prices and rig bids for Automotive Brake Hoses installed in cars sold in the United States and elsewhere.

290.  On November 24, 2014, the DOJ announced that Continental had agreed to plead guilty and to pay a criminal fine of $4 million for its role in a

conspiracy to rig bids of Instrument Panel Clusters installed in Motor Vehicles manufactured and sold in the United States and elsewhere.  Continental also previously had been fined in December 2013 by South Korea's Fair Trade Commission ("KFTC") for fixing prices for Instrument Panel Clusters.

291.  On January 27, 2015, the DOJ announced that Sanden Corporation agreed to plead guilty to a one count Criminal Information and pay a $3.2 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to fix, stabilize, and maintain the prices of compressors used in Air Conditioning Systems sold to Nissan North America, Inc. in the United States and elsewhere.

292.  On March 31, 2015, the DOJ announced that Bosch agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for Spark Plugs, Oxygen Sensors and Starters sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

293.  On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. agreed to plead guilty to a one-count criminal information and to pay a $2.5 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix,

stabilize, and maintain the prices of manual steering columns sold to certain subsidiaries of Honda Motor Co., Ltd., in the United States and elsewhere.

294.   On September 3, 2015, the DOJ announced that NGK Insulators Ltd. agreed to pay a $65.3 million criminal fine and plead guilty to a two-count criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of Ceramic Substrates for automotive catalytic converters supplied to automobile manufacturers in the United States and elsewhere.  NGK Insulators also agreed to plead guilty to obstruction of justice for altering, destroying or concealing documents with the intent to impede the criminal antitrust investigation.

295.   On November 19, 2015, the DOJ announced that INOAC agreed to plead guilty and to pay a $2.35 million criminal fine for its role in a conspiracy to fix prices and rig bids on certain plastic interior trim Auto Parts installed in cars sold to U.S. consumers.

296.   On July 20, 2016, the DOJ announced that Nishikawa agreed to plead guilty and to pay a $130 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of Body Sealings sold to Honda, Toyota and Fuji Heavy Industries Ltd. (Subaru) and certain of their subsidiaries

and affiliates in the United States and elsewhere. According to the DOJ press release, Nishikawa's conduct primarily targeted the United States.

297.   On August 9, 2016, the DOJ announced that Defendant Hitachi Automotive Systems Ltd. agreed to plead guilty and pay at least a $55.48 million fine for its role in a conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to allocate the market for, rig bids for, and to fix, stabilize, and maintain the prices of Shock Absorbers sold to Motor Vehicle manufacturers in the United States and elsewhere.   Hitachi's 2016 fine was substantially affected by its agreement with the Department of Justice in 2013 to plead guilty and pay a $195 million fine for fixing the price of starters, alternators and other electrical automotive components.   At that time, Hitachi received credit for substantially assisting the DOJ's investigation.   But, in the course of providing that assistance, Hitachi failed to uncover that it had also conspired to fix the price of Shock Absorbers.   As a result of Hitachi's failure to divulge the entire scope of its illegal conduct at the time of its first plea agreement, the DOJ recommended a substantial increase in Hitachi's criminal fine also recommend that the court place Hitachi on probation for three years.

298.   On September 15, 2016, the DOJ announced that Defendant ALPHA Corporation agreed to pay a $9 million criminal fine and plead guilty to a one-count criminal information charging it with participating in a combination and

conspiracy to suppress and eliminate competition in the Auto Parts industry by agreeing to allocate the market for, rig bids for, and to fix, stabilize, and maintain the prices of Access Mechanisms sold to Motor Vehicle manufacturers in the United States and elsewhere.

299.   On November 8, 2016, the DOJ announced that Usui Kokusai Sangyo Kaisha, Ltd. agreed to plead guilty to a one count criminal Information and pay a $7.2 million fine for conspiring to fix prices, rig bids, and allocate the market for Automotive Steel Tubes sold to automobile manufacturers in the United States and elsewhere.

300.   On March 7, 2017, the DOJ announced that Kiekert AG, agreed to plead guilty and to pay a $6.1 million criminal fine for its role in a conspiracy to rig bids of Side Door Latches and Latch Minimodules installed in cars sold in the United States and elsewhere.

301.   On March 8, 2017, the European Commission fined six individual Auto Parts Manufacturers for their participation in a conspiracy to coordinate prices of climate control components and engine cooling components to certain car manufacturers in the European Union.  Calsonic was fined approximately €1.7 million euros for its role in a conspiracy to coordinate prices of HVACs, radiators and fans, all component parts of Air Conditioning Systems;  Sanden Corporation was fined approximately €63.2 million euros for its role in a conspiracy to

116

coordinate prices of air compressors and 1.4 million euros for its role in a conspiracy to coordinate prices of HVAC systems; and MAHLE Behr was fined approximately 62.1 million euro for its role in a conspiracy to coordinate prices of HVAC systems.  According to the European Commission, all six manufacturers fined for the conspiracies, including Calsonic, Sanden and MAHLE Behr, acknowledged their involvement in the conspiracies as part of a settlement agreement with European regulators.

302.  On November 27, 2017, the DOJ announced that Stanley had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of lamp ballasts installed in cars sold in the United States and elsewhere.

303.  To date, at least forty-nine companies and sixty-five individuals have been charged in the DOJ's Antitrust Division's ongoing investigation into price-fixing and bid rigging in the Auto Parts industry.  Together, these companies and executives have agreed to pay more than $2.9 billion in criminal fines. The Antitrust Division continues to regularly announce new indictments and guilty pleas in the automotive industry as part of its ongoing criminal investigation.

304. Former United States Attorney General Eric Holder estimated in September 2013 that "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more

than 25 million cars purchased by American consumers were affected by the illegal conduct." Scott D. Hammond, former Assistant Attorney General of DOJ's Antitrust Division's Criminal Enforcement Program, stated that "[s]ome of these price-fixing conspiracies lasted for a decade or longer."

305. The DOJ, in its public announcements, described how the Defendants and their co-conspirators carried out these multiple conspiracies. Defendants and their co-conspirators agreed, during meetings and conversations, to allocate the supply of named Auto Parts products on a model-by-model basis and to coordinate price adjustments. To maintain the secrecy of the conspiracies, Defendants and their co-conspirators used code names, met in remote or private locations, instructed their co-conspirators to destroy correspondence after reading and employed other measures. They also ensured that their co-conspirators adhered to the agreements through an informal monitoring system and punished them when they did not.

## III. Evidence Exists that Defendants and Their Co-Conspirators Rigged Bids and Fixed Prices

306. There is ample evidence that Defendants and their co-conspirators have been engaged in a decades-long conspiracy to rig bids and fix prices for Auto Parts. The following paragraphs contain illustrative examples of Defendants' and their co-conspirators' unlawful activity.

118

### A. Air Conditioning Systems

307.   Calsonic, MAHLE Behr, Sanden (the "Air Conditioning System Defendants") and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Air Conditioning Systems.  Throughout the conspiracy, the Air Conditioning System Defendants entered into individual agreements to divide the market for Air Conditioning Systems based on incumbency; to fix the prices of Air Conditioning Systems both in response to Requests for Quotations ("RFQs") and Annual Price Reductions ("APRs"); and to submit complementary bids and prices for Air Conditioning Systems to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

308.   In 1999, representatives from Sanden and another Auto Parts manufacturer discussed a sourcing for air compressors for the 2001 Honda Civic, which was sold in the United States.  During these discussions, the other Auto Parts manufacturer agreed to respect Sanden's existing business and allow Sanden to win the bid.  Consistent with their agreement, Sanden won the bid for the 2011 Civic.

309.   In 2005, Honda issued a RFQ for a compressor for the 2008 Accord, which was sold in the United States.  Representatives Sanden and another Auto Parts manufacturer met, and Sanden agreed to respect the other manufacturer's

existing business. In accordance with this unlawful agreement, Sanden bid lower than the other manufacturer, and the other manufacturer won the business.

### B. Air Fuel Ratio Sensors

310. NGK Spark Plugs and its co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Air Fuel Ratio Sensors. Throughout the conspiracy, NGK Spark Plugs entered into individual agreements to divide the market for Air Fuel Ratio Sensors based on incumbency; to fix the prices of Air Fuel Ratio Sensors both in response to RFQs and APRs; and to submit complementary bids and prices for Air Fuel Ratio Sensors to OEMs to create an appearance of competition. The following are examples of these unlawful agreements.

311. In March 2005, Honda issued a preliminary RFQ to NTK, a NGK Spark Plugs subsidiary, and another Auto Parts manufacturer for Air Fuel Ratio Sensors for the L4 and V6 Engines for the 2008 Honda Accord and 2008 Honda Fit. The Accord was made and sold in the United States; the Honda Fit was sold in the United States. Representatives from NTK and the other manufacturer met and agreed that the other manufacturer would bid lower for L4, and NTK would bid lower for V6, consistent with the parties' incumbency rights. As agreed, the other manufacturer won the bid for the L4, and NTK won the bid for the V6.

120

### C. ATF Warmers and Oil Coolers

312. Calsonic and its co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for ATF Warmers and Oil Coolers. Throughout the conspiracy, Calsonic entered into individual agreements to divide the market for ATF Warmers and Oil Coolers based on incumbency; to fix the prices of ATF Warmers and Oil Coolers both in response to RFQs and APRs; and to submit complementary bids and prices for ATF Warmers and Oil Coolers to OEMs to create an appearance of competition. The following are examples of these unlawful agreements.

313. During the ATF Warmers and Oil Coolers Relevant Time Period, Calsonic exchanged information on bids and prices with its competitors. For example, in May 2001, Calsonic met with another Auto Parts manufacturer to discuss warmers for the Fuji Heavy Industries 21Z Legacy. Calsonic had the existing business for the 4-cylinder. The other manufacturer agreed with Calsonic that it would respect Calsonic's existing business and not bid aggressively on the 4-cylinder. On information and belief, Calsonic won the 4-cylinder business, consistent with their unlawful agreement.

### D. Ceramic Substrates

314. NGK Insulators and its co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Ceramic Substrates. Throughout the

conspiracy, NGK Insulators entered into individual agreements to divide the market for Ceramic Substrates based on incumbency; to fix the prices of Ceramic Substrates both in response to RFQs and APRs; and to submit complementary bids and prices for Ceramic Substrates to OEMs to create an appearance of competition. The following are examples of these unlawful agreements.

315.   In 2000, General Motors ("GM") sought to use a new third supplier for Ceramic Substrates to increase competition in the market and planned on issuing a worldwide procurement in 2001.   GM issued a RFQ for Ceramic Substrates for the 2003-2006 Saab (T256) and the 2003-2006 trucks (T345/H3 and T55/GMC Canyon/Chevy Colorado).   Representatives from NGK Insulators met with representatives from another Auto Parts manufacturer to discuss the new bids. NGK Insulators and the other manufacturer exchanged bids and agreed on a maximum level of production for the other manufacturer of 1.5 million units per year if it became the third supplier.   GM awarded the other manufacturer the position of the third supplier.   The other manufacturer and NGK Insulators continued to exchange bid information regarding other RFQs issued by General Motors through at least April 2007.

316.   In 2005, Nissan/Renault sourced ultra-thin wall and hexagonal monoliths (type of Ceramic Substrate) and issued a request for information to suppliers not currently supplying monoliths for Nissan for various models sold in

the United States.  Representatives from NGK Insulators met with representatives from another Auto Parts manufacturer to discuss their bids.  During the meetings, NGK Insulators shared information about its bids for hexagonal monoliths and stated that it wanted to defend its market share for the part.  Ultimately, NGK Insulators and the other manufacturer agreed that NGK Insulators would permit the other manufacturer to gain some share, and the other manufacturer would bid lower on the hexagonal business.  Consistent with their unlawful agreement, the other manufacturer was selected as a panel supplier.  From 2005 through at least October, 2009, NGK Insulators and the other manufacturer continued to share bid information on multiple Nissan RFQs and discussed desired market shares and price levels for Ceramic Substrates.

317.   In 2001, Mazda issued a RFQ to NGK Insulators and other manufacturers of Ceramic Substrates.  The RFQ did not specify models, but addressed Mazda models manufactured and sold in the United States.  NGK Insulators shared its pricing information with potential competitors, and its competitors agreed not to compete with NGK Insulators for the Mazda RFQ.

### E. Fan Motors

318.   MITSUBA and its co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Fan Motors.  Throughout the conspiracy, MITSUBA entered into individual agreements to divide the market for Fan Motors

123

based on incumbency; to fix the prices of Fan Motors both in response to RFQs and APRs; and to submit complementary bids and prices for Fan Motors to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

319.  In late 2001 or early 2002, Calsonic's development team issued inquiries regarding a new fan motor technology.  An Auto Parts manufacturer and its subsidiary discussed their potential bids on the new technology with MITSUBA.  MITSUBA had previously coordinated its bids with the other manufacturer and its subsidiaries on other sourcings.  In January 2001, MITSUBA met with representatives of the other manufacturer.  The other manufacturer did not want the business and informed MITSUBA it would instruct its subsidiary not to aggressively pursue the business so MITSUBA could win.  After the meeting, the other manufacturer agreed that its subsidiary would not bid below certain minimum bids, but could continue to discuss potential opportunities with Calsonic. MITSUBA and the subsidiary of the other manufacturer exchanged bid information, and the subsidiary submitted a quote to Calsonic consistent with its discussions with MITSUBA.  After the subsidiary submitted its quote, MITSUBA contacted the subsidiary again notifying it that it would be increasing its prices for cylinder fan motors and asked the subsidiary not to bid lower than it if Calsonic contacted it requesting a new bid.  When Calsonic subsequently contacted the

124

subsidiary, the subsidiary did not bid aggressively, consistent with its unlawful agreement with MITSUBA.  On information and belief, MITSUBA won the bid.

### F. Fuel Injection Systems

320.   Aisan, Bosch, MITSUBA and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Fuel Injection Systems. Throughout the conspiracy, Aisan, Bosch and Mitsuba entered into individual agreements to divide the market for Fuel Injection Systems based on incumbency; to fix the prices of Fuel Injection Systems both in response to RFQs and APRs; and to submit complementary bids and prices for Fuel Injection Systems to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

321.   Bosch discussed its bids with competitors and entered into illegal agreements with competitors to maintain particular bid levels.  For instance, in 2003, Bosch sought to become a supplier for Toyota in its United States-sold Motor Vehicles.  It met with representatives from another Auto Parts manufacturer at Bosch's headquarters in Germany to discuss the nature of the market for fuel injectors and common bid levels for RFQs.  The other manufacturer and Bosch agreed not to reduce their bid levels.

322.   In 2009, Mitsubishi Heavy Industries issued a RFQ for its 2012 K38 3 Cycle and K39 4 Cycle engines, which were sold in the United States.  Bosch met

with competitors, exchanged bid information and coordinated on final bids with its competitors.

323.   From 2007 to 2009 employees at Hyundam, an Aisan subsidiary, exchanged bid information and negotiated with competitors about market share. For example, in 2008, a fuel tank manufacturer issued a RFQ for several models manufactured and sold in the United States: the Hyundai Elantra (MD), Elantra I30 (GD) and the Kia Forte (YD).  Representatives from Hyundam exchanged bids with competitors and successfully arranged for Hyundam to win the bid for several models of the Hyundai Elantra.  In January 2009, Hyundai issued a RFQ for the same Motor Vehicles to be supplied directly to Hyundai.  Hyundam agreed with its competitors not to lower its bid levels to allow its competitors to charge supra-competitive prices.

324.   In 2009, Mitsubishi Motors Corporation issued a RFQ to Aisan and its co-conspirators for Fuel Injection Systems for models of the Mirage and the Outlander, both of which were sold in the United States.  In July 2009, Aisan met with representatives from another Auto Parts manufacturer to discuss bid levels and division of the RFQ.  Aisan and the other manufacturer shared bids, agreed on a plan of bidding and were awarded portions of the RFQ in accordance with their unlawful agreement.

### G. HID Ballasts

325.   KOITO, Stanley and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for HID Ballasts.  Throughout the conspiracy, KOITO and Stanley entered into individual agreements to divide the market for HID Ballasts based on incumbency; to fix the prices of HID Ballasts both in response to RFQs and APRs; and to submit complementary bids and prices for HID Ballasts to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

326.   Beginning in 1998, six individual Auto Parts manufacturers, including KOITO and Stanley, held regular "Rokusha-kai" meetings—at least semi-annually—in Japan to discuss appropriate bid levels for HID Ballasts.  The purpose of the meetings was to coordinate shares, exchange information and enter agreements.  At these meetings, representatives would discuss and agree on minimum bid levels for HID Ballasts, which had the effect of elevating prices for HID Ballasts, including at least some HID Ballasts installed in Motor Vehicles sold in the United States.  For example, in 1998, the Rokusha-kai agreed to set the minimum bid for the year 2000 for HID Ballasts at 6000 yen.  This bid level was to apply to sourcings for Toyota, Nissan, Honda, Mitsubishi Motors, Mazda, FHI, Suzuki, Daitsu, Hino and Isuzu.  The participants also discussed ways to keep competitors who were not part of the Rokusha-kai out of the market.

127

At a later Rokusha-kai, the parties agreed that the company with pre-existing commercial rights in a sourcing (the incumbent supplier) would submit the lowest bid for future HID Ballast RFQs.  The participants in these meetings documented their agreements.  In 2002, the parties determined that, going forward, they would discuss individual RFQs among one another on an individual basis.

327.   Consistent with their agreement to discuss RFQs on an individual basis, in November 2002, KOITO and three other manufacturers met at another manufacturer's headquarters to discuss a RFQ issued by Mitsubishi Motors Corporation for several models, including the Dion, Grandis (minivans) and Cedia. The Cedia may have been sold in the United States as the Lancer.  The parties recognized one manufacturer had commercial rights.  KOITO and the other two manufacturers each agreed that they would submit higher bids and respect the incumbent manufacturer's rights.  Consistent with their unlawful agreement, the incumbent manufacturer won the business.

328.   Prior to 2007, KOITO and another Auto Parts manufacturer enjoyed a 50%-50% split of the HID Ballast business for Toyota.  In 2007, Toyota requested that KOITO and the other manufacturer work together to source 4.5 generation HID Ballasts, at least some of which were likely installed in Motor Vehicles sold in the United States.  Toyota requested that the other manufacturer supply the Hybrid Integrated Circuit (HIC) chip, one component of some HID Ballasts, and

128

that KOITO supply and assemble the other component parts of the ballast. Representatives KOITO and the other manufacturer discussed and coordinated their bids for the 4.5 generation HID Ballast in order to maintain the historical 50%-50% split.  Consistent with their unlawful market allocation, KOITO and the other manufacturer each retained a 50%-50% split.

### H. Instrument Panel Clusters

329.   Continental and its co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Instrument Panel Clusters.  Throughout the conspiracy, Continental entered into individual agreements to divide the market for Instrument Panel Clusters based on incumbency; to fix the prices of Instrument Panel Clusters both in response to RFQs and APRs; and to submit complementary bids and prices for Instrument Panel Clusters to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

330.   In December 2007, representatives from Continental and another Auto Parts manufacturer had a phone call to discuss Instrument Panel Cluster sourcings for the Hyundai Sonata (YF) and XM.  Continental had recently lost the business for the Hyundai Sonata (YF) to the other manufacturer, and the other manufacturer had recently lost the XM business.  After the phone call, representatives from Continental and the other manufacturer met at a blowfish restaurant to further discuss their existing business and how to allocate particular sourcings in the

129

future.  At that meeting, Continental and the other manufacturer agreed to respect each other's rights in the future and to communicate regarding future sourcings so as to reach agreement on an allocation of business.  Later, in February 2008, to memorialize their agreement, the two companies signed a written price-fixing agreement listing upcoming RFQs and how they would allocate the business.

331.  In October 2008, Hyundai Ikea issued a RFQ for Instrument Panel Clusters for the Veloster (FS), which was sold in the United States. Representatives from Continental called representatives from another Auto Parts manufacturer to discuss the RFQ and determine who would win the RFQ. Continental and the other manufacturer agreed that the other manufacturer would bid higher so Continental could win the bid.  Consistent with their unlawful agreement, Continental won the Veloster (FS) business.

332.  In 2011, Hyundai Ikea issued  a RFQ for Instrument Panel Clusters for the Genesis (DH), which was sold in the United States.  Representatives from Continental and another Auto Parts manufacturer discussed the RFQ over the phone, and  Continental asked the other manufacturer to bid higher than Continental so Continental could win the sourcing.  The other manufacturer agreed.  Consistent with their unlawful agreement, the other manufacturer bid higher, and Continental won the bid.

130

### I. Power Window Motors

333.   MITSUBA and its co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Power Window Motors.  Throughout the conspiracy, MITSUBA entered into individual agreements to divide the market for Power Window Motors based on incumbency; to fix the prices of Power Window Motors both in response to RFQs and APRs; and to submit complementary bids and prices for Power Window Motors to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

334.   In 2009, Nissan issued a RFQ for Power Window Motors for several Motor Vehicle models, including the Nissan Leaf (X12G) and Nissan Armada (X12J), which were manufactured in the United States.   Representatives from MITSUBA and another Auto Parts manufacturer discussed their bids over the phone.  During their discussions, the companies agreed that MITSUBA would bid lower than the other manufacturer and win the sourcing.  Consistent with their unlawful agreement, MITSUBA won the bid for the Nissan Leaf and Armada.

335.   In 2009, Honda and Toyota issued a RFQ for Power Window Motors for several Motor Vehicle models including FHI FR Sport (BRZ E88/AS1) and Toyota Scion (GT 86). MITSUBA and another Auto Parts manufacturer met in 2009 at a restaurant in Tokyo to discuss bids.  Over dinner, MITSUBA and the other manufacturer agreed that the other manufacturer would bid lower if asked to

do so to win the business.  Consistent with their unlawful agreement, the other manufacturer won the bid.

### J. Radiators

336.   Calsonic, MITSUBA and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Radiators.  Throughout the conspiracy, Calsonic and MITSUBA entered into individual agreements to divide the market for Radiators based on incumbency; to fix the prices of Radiators both in response to RFQs and APRs; and to submit complementary bids and prices for Radiators to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

337.   In July 2008, Fuji Heavy Industries (now Subaru Corporation) issued a RFQ to Calsonic and two other Auto Parts manufacturers for Radiators and fans for the Subaru FR Sports Car (E88) and Impreza, which was sold in the United States.  In August 2008, Calsonic and one of the other manufacturers met twice to exchange bids and agreed that Calsonic would bid lower for the Impreza. Consistent with their unlawful agreement, Calsonic bid lower for the Impreza. Calsonic won the bid for the Impreza, and the other manufacturer won the bid for the E88.

### K. Spark Plugs

338.   Bosch, NGK Spark Plugs and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Spark Plugs.  Throughout the conspiracy, Bosch and NGK Spark Plugs entered into individual agreements to divide the market for Spark Plugs based on incumbency; to fix the prices of Spark Plugs both in response to RFQs and APRs; and to submit complementary bids and prices Spark Plugs to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

339.   In 2000, Suzuki issued a RFQ issued for iridium Spark Plugs for its XV051 (GSX1400) to NTK, a NGK Spark Plugs subsidiary, and another Auto Parts manufacturer.  In the first round of bidding, NTK and the other manufacturer submitted identical bids.  Suzuki requested another round.  NTK and the other manufacturer met and coordinated on the appropriate bid for the following round. In accordance with the companies' agreement, the companies were awarded the RFQ in proportion to their pre-existing market share.

340.   In 2004, Suzuki issued a RFQ for Spark Plugs for its JV Engine, which was used in Motor Vehicles sold in the United States, including the SX4, Kizashi and Grand Vitara.  Representatives from NTK (a NGK Spark Plugs subsidiary) and another Auto Parts manufacturer met and exchanged bids.  The companies agreed that the other manufacturer would bid lower for the nickel

133

specifications, and  NTK would bid lower for iridium specifications.  Consistent with their unlawful agreement and market allocation, the other manufacturer won the nickel business, and NTK won the iridium business.

341.  In 2005, Toyota issued a RFQ for Spark Plugs for its 2006 ZR Engine, used in Motor Vehicles sold in the United States.  Representatives of NTK (a NGK Spark Plugs subsidiary) and another Auto Parts manufacturer had at least one phone call and meeting to discuss the sourcing and how they would coordinate their bids.  During these discussions, the other manufacturer informed NTK that it wanted to win the orders.  The parties agreed the other manufacturer would win but they also agreed NTK would only bid slightly higher than the other manufacturer to remain competitive in the event Toyota did not choose the other manufacturer's product.  NTK and the other manufacturer exchanged bids.  As unlawfully agreed, the other manufacturer won the business for the ZR engine.

342.  In 2005, NTK (a NGK Spark Plugs subsidiary) and another Auto Parts manufacturer rigged bids for the 2009 General Motors HVV6 engine, which was used in Motor Vehicles made and sold in the United States, such as the Buick Lucerne, Chevy Malibu, Pontiac G6 and Satura Aura.   NTK previously manufactured spark plugs for the HVV6 engine.  NTK and the other manufacturer discussed the RFQ and their planned market allocation.  During discussions in 2005, the other manufacturer agreed to respect NTK's rights, and both agreed that

134

NTK would bid lower for the business. During a call in November 2005, NTK and the other manufacturer solidified the agreement and confirmed their planned bids to ensure they were consistent with the agreed allocation. As unlawfully agreed, the NTK won this business.

343. In 2007, Mazda issued a RFQ for the new Sky G engine. The Sky G was used in Motor Vehicles, including the Mazda 6, Mazda 3 and CX5, that were sold in the United States. At the time, another Auto Parts manufacturer was the incumbent for the Z engine, and NTK (a NGK Spark Plugs subsidiary) was the incumbent for the I4 engine. Representatives from NTK and the other manufacturer met and discussed bids to submit for different specifications of the Sky G. The business was not awarded at that time. However, a new RFQ was issued two years later in May 2009. Mazda indicated it wanted a 50/50 market share split for the Sky G. In June 2009, representatives from NTK and the other manufacturer met and agreed that the other manufacturer would bid lower for the needle-to-needle spark plug and NTK would bid lower for the iridium spark plug. The parties submitted their bids consistent with the unlawful agreement, with the other manufacturer winning the needle-to-needle business and NTK winning the iridium business.

### L.  Standard Oxygen Sensors

344.   Bosch, MITSUBA and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Standard Oxygen Sensors. Throughout the conspiracy, Bosch and MITSUBA entered into individual agreements to divide the market for Standard Oxygen Sensors based on incumbency; to fix the prices of Standard Oxygen Sensors both in response to RFQs and APRs; and to submit complementary bids and prices for Standard Oxygen Sensors to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

345.   Beginning in 2000, NTK (a NGK Spark Plugs subsidiary) and another Auto Parts manufacturer regularly exchanged bid information for Standard Oxygen Sensors in motorcycles manufactured by Yamaha and Suzuki.  Yamaha would typically sole source from the other manufacturer, and Suzuki would source from NTK.  For example, in May 2004, Kawasaki issued a RFQ for Standard Oxygen Sensors for its ER650 Ninja Motorcycle to NTK and the other manufacturer.  NTK invited representatives from the other manufacturer to meet at NTK's Osaka office. At the meeting, the other manufacturer informed NTK it wanted to win the business, and the two companies agreed that they would bid at similar levels and NTK would not underbid the other manufacturer.  In accordance with the companies' agreement, the other manufacturer won the bid.

346.   In 2008, Chrysler issued a RFQ for UHEGO Oxygen Sensors for the World Engine for the Chrysler 200 and Dodge Journey, both of which were sold in the United States.  NTK, a subsidiary of NGK Spark Plugs, met with a competitor to discuss the RFQ.  During a meeting between representatives of NTK and another Auto Parts manufacturer in May 2008, the other manufacturer agreed to respect NTK's incumbency and existing rights.  Consistent with the unlawful agreement, NTK won the bid.

347.   In June 2005, Suzuki issued a RFQ for Standard Oxygen Sensors for the JB engine, which was installed in the XS4 and Escudo Motor Vehicles. Versions of the XS4 were sold in US.  NTK, a NGK Spark Plugs subsidiary, and another Auto Parts manufacturer discussed the sourcing by phone.  NTK agreed to respect the other manufacturer's existing rights and to bid higher than the other manufacturer.  Consistent with their unlawful agreement, the other manufacturer won the business.

348.   In 2004, Mitsubishi Motors Corporation issued a RFQ for Standard Oxygen Sensors for the RA3 Engine used in Motor Vehicles sold in the United States.  Following the issuance, representatives from NTK (a NGK Spark Plugs subsidiary) and another Auto Parts manufacturer met at NTK's offices to discuss the sourcing.  NTK agreed to respect the other manufacturer's incumbency rights

137

and submit a higher bid.  Consistent with their unlawful agreement, the other manufacturer won the business.

### M. Starters

349.   Bosch, MITSUBA and their co-conspirators participated in a wide-ranging conspiracy to rig bids and fix prices for Starters.  Throughout the conspiracy, Bosch and MITSUBA entered into individual agreements to divide the market for Starters based on incumbency; to fix the prices of Starters both in response to RFQs and APRs; and to submit complementary bids and prices Starters to OEMs to create an appearance of competition.  The following are examples of these unlawful agreements.

350.   In early 2001, Honda issued a RFQ for Starters for the 2003 Honda Accord, including two models sold in North America, the NA V6 version and NA L4 engine.  MITSUBA and another Auto Parts manufacturer received the RFQ for the NA L4 version.  MITSUBA separately received a RFQ for the NA V6 version. MITSUBA and the other manufacturer met to discuss the RFQ for the NA L4 engine and exchanged bids.  The other manufacturer agreed to allow MITSUBA to win the bid for the NA L4.  MITSUBA asked the other manufacturer to coordinate on its behalf with a third competitor on the NA V6 bid.  The other manufacturer met with the third competing manufacturer, and the third manufacturer agreed to

bid higher than MITSUBA on the part.  Consistent with their unlawful agreement, MITSUBA won the bids for both the NA V6 and NA L4 Starters.

351.   In 2003, Honda issued a global RFQ for Starters to be used in the 2006 Civic, some of which were manufactured and sold in the United States.  After receiving the RFQ, MITSUBA met with two other Auto Parts manufacturers to discuss a bidding strategy for the 1.2 kilowatt and 1.6 kilowatt Starters.  For the 1.2 kilowatt starter, MITSUBA and one of the manufacturers agreed that the third manufacturer could submit the low bid for the North American portion of the business.  In accordance with their unlawful agreement, MITSUBA submitted a low-winning bid for the 1.6 kilowatt Starters to be manufactured in North America.

352.   In November 2009, Audi and Volkswagen issued a RFQ for Starters for gasoline and diesel engines, including for the VW Golf and Audi A3 models, which were sold in the United States.  On November 8, 2009, Bosch and another Auto Parts manufacturer had numerous calls to discuss proposed bids and market share.  Bosch and the other manufacturer ultimately agreed to submit bids at the same level.

353.   In 2009, BMW issued a RFQ to MITSUBA and other Auto Parts manufacturers for Starters in its 2012 2-cylinder K5X.  In October 2009, MITSUBA officials met at one of the manufacturer's Tokyo office to discuss bid levels and desired market division.  That month, the two companies exchanged

139

proposed bids for the RFQ, and exchange bid information obtained from other competitors. MITSUBA agreed to submit a higher bid than the other manufacturer. In January 2010, MITSUBA and the other manufacturer met again at the other manufacturer's Tokyo office to confirm bids. The two companies coordinated on revised proposed bids in order to comply with demands from BMW.

## IV.   The Unique Structure and Characteristics of the Auto Parts Industry Facilitated the Unlawful Conspiracies

354. Collusion is more likely to occur in some industries than others. Conditions of the Auto Parts industry are particularly favorable to collusion and consequently have fostered price-fixing, bid rigging and market allocation practices. Specifically, the unique characteristics of the Auto Parts industry include (1) high barriers to entry; (2) inelasticity of demand and standardization of Auto Parts; (3) a unique culture of cooperation and (4) high market concentration for particular Auto Parts.

### A.   The Auto Parts Industry Has High Barriers to Entry

355. The ease with which new firms may enter a market impacts whether a particular industry may be susceptible to collusion and cartel behavior. Generally, if competitors collude and agree to raise prices, the collusive behavior attracts new entrants seeking to undercut the supra-competitive prices. If a particular industry

140

has high barriers to entry, however, new entrants are less likely to enter a market in response to an increase or stabilization of prices.  High entry barriers thus facilitate the formation and maintenance of a cartel.

356.   As described above, numerous Auto Parts submarkets exist, including the Access Mechanisms Market, Air Conditioning Systems Market, Air Fuel Ratio Sensors Market, Anti-Vibrational Rubber Parts Market, ATF Warmers and Oil Coolers Market, Automotive Bearings Market, Automotive Brake Hoses Market, Automotive Constant-Velocity-Joint Boot Products Market, Automotive Lamps Market, Automotive Steel Tubes Market, Automotive Wire Harness Systems Market, Body Sealings Market, Ceramic Substrates Market, Electric Powered Steering Assemblies Market, Exhaust Systems Market, Fan Motors Market, Fuel Injection Systems Market, Heater Control Panels Market, High Intensity Discharge Ballasts Market, Ignition Coils Market, Instrument Panel Clusters Market, Interior Trim Products Market, Power Window Motors Market, Radiators Market, Shock Absorbers Market, Side Door Latches and Latch Minimodules Market, Spark Plugs Market, Standard Oxygen Sensors Market, Starters Market, Windshield Washer Systems Market and Windshield Wiper Systems Market (collectively the "Auto Parts Submarkets"). There are substantial barriers that preclude, reduce or make entry into the Auto Parts Submarkets more difficult. A new entrant in the Auto Parts Submarkets would face costly and lengthy start-up costs, including

multimillion dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, securing skilled labor and establishing customer relationships.

357. The high research and development costs associated with the Auto Parts industry also deter potential entrants. Auto Parts manufacturers are constantly researching the functionality and safety of their parts. To compete, an entrant must be committed to spending a significant amount of resources on research and development.

358. Defendants also own patents on various Auto Parts. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product by either seeking a license or designing around the applicable patent.

359. In addition, repair professionals have little choice in selecting the Auto Parts manufacturer from which they will purchase parts. OEMs design the features of their Motor Vehicles so that specific Auto Parts are integrated with other Auto Parts, electronics and mechanics of the particular Motor Vehicle model. Thus, when repair professionals need to replace an Auto Part, they are limited to those manufacturers who sell the part that fits a particular Motor Vehicle model. For a new entrant, it would be difficult—if not impossible—to offer Auto Parts for sale, particularly when patents are at issue.

142

### B.     There is Inelasticity of Demand for Auto Parts

360.   Cross-elasticity of demand measures the extent to which the quantity demanded of one product or service will change in response to a change in the price of a second product or service.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.

361.   The lack of available substitute products or services contributes to the cross-elasticity of demand.  High cross-elasticity of demand between two products indicates that the products are good substitutes for one another.  If products cannot be easily substituted for the product at issue, or if there are other restrictive specifications of the products, the probability of collusion increases.

362.   Fewer substitutes, and thus inelastic demand, facilitate collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

363.   Demand for Auto Parts is highly inelastic because there are no close substitutes for these products.  As discussed, OEMs design the features of their Motor Vehicles so that the Auto Parts they purchase for a Motor Vehicle are then integrated with the other parts, electronics and mechanics of a particular Motor Vehicle model.  Thus, available and feasible substitutes are inherently limited because repair professionals must use a specific Auto Part.  Consequently, when

143

insureds, claimants or GEICO need to replace a defective or damaged part in their Motor Vehicles, they have little choice in Auto Parts, even if the prices are maintained at a supra-competitive level.

## C.    Certain Auto Parts Submarkets Are Highly Concentrated

364.    Collusion is more likely if there are fewer sellers.  With fewer sellers in a given market, the competing sellers may more easily coordinate their actions and collude.  Not only does a concentrated market facilitate actual collusion, but concentrated markets may also assist conspirators in policing the cartel.  With fewer competitors, cartel members may more easily detect and punish firms that deviate from the collusive behavior.

365.    There is a high level of concentration among manufacturers in several of the Auto Parts Submarkets.  In those concentrated submarkets, manufacturers often communicated regularly, both in business meetings and socially.  Through regular communication among manufacturers, Defendants and their co-conspirators were able to easily detect if a conspirator did not follow the agreed market allocation or bid agreement.  Defendants and their co-conspirators punished those who did not adhere to the bid-rigging and market allocation agreements. Further, Defendants dominate many of the Auto Parts Submarkets and exercise control over prices and the conspiracies challenged here.

144

### D.    The Culture of the Auto Parts Industry Is Conducive to Collusion

366.   Collusion is more likely to occur if the competitors know each other through trade associations, conferences, social connections, business contacts or shifting employment.  The close-knit culture of the Auto Parts industry fostered and presented opportunities for Defendants and their co-conspirators to conspire.

367.   Defendants attended and continue to attend industry events and conferences where they have the opportunity to meet, agree on prices and other anticompetitive practices and coordinate carrying out the acts necessary for the operation and furtherance of the alleged conspiracies.  For example, the Original Equipment Suppliers Association ("OESA") hosts an annual conference in Detroit, Michigan, which provides numerous opportunities for Auto Parts manufacturers to meet and conspire.  In addition, OESA is comprised of numerous councils and committees, further providing Auto Parts members opportunities to coordinate and further their conspiracies.   OESA is just one example of an industry organization that may have served as a conduit for conspiratorial conduct.

368.   Auto Dealers and other industry participants (possibly unknowingly) also facilitated Auto Parts conspiratorial conduct.  Toyota has a supplier group called Kyohokai, which hosts golf and other social outings for executives of more than 200 companies to get to know each other and share information.  Established

145

in 1943, Kyohokai also holds executive roundtables and makes proposals to Toyota on particular issues. Kyohokai offered one platform in which the Defendants could organize and further their conspiracies.

369. Finally, the culture of the companies themselves played a significant role. Much of the focus of the global government investigations has been on Japanese suppliers. Business traditions and the unique culture in Japan contributed to this collusion, as industrial groups tend to favor cooperation over competition.

370. This culture of "cooperation" was evident during the 1998-2002 Rokusha-kai meetings. During this time, executives from six key manufacturers of HID Ballasts, including KOITO and Stanley, met on a bi-annual basis to discuss the HID Ballast industry and other business matters. During these meetings, the attendees agreed to set a minimum price for HID Ballasts bids; each Rokusha-kai member agreed not to bid lower than this minimum price for HID Ballasts during the given year.

(a)     The Rokusha-kai meetings, which took place in Japan, were hosted on a rotating basis by one of the six Rokusha-kai attendees. During the initial Rokusha-kai meetings, each of the Rokusha-kai attendees was designated as a "coordinating company" for a particular OEM. That company was responsible for "managing" their designated OEM.

146

(b)     The bi-weekly Rokusha-kai meetings gave the Rokusha-kai members an opportunity to conduct business face-to-face.  The  meetings provided the perfect opportunity for the companies to coordinate prices and otherwise manipulate the market for HID Ballasts.

## V.     Price Fixing, Bid Rigging and Market Allocation Are *Per Se* Unlawful

371.   Price fixing occurs when two or more competitors agree to actions that have the effect of raising, fixing or stabilizing prices of a product or service. Price fixing is a *per se* violation of the Sherman Act and may be proven by direct or circumstantial evidence.

372.   With bid rigging, competitors will agree in advance on how parties will bid on a contract subject to the competitive bid rigging process.  Bid rigging may take many forms and serves as a means of conspiring competitors to raise prices when purchasers solicit competing bids.  Bid rigging is a *per se* violation of the antitrust laws.

373.   Market allocation occurs when two or more competitors agree to divide sales territories, assign customers or allocate a specific percentage of available business to each producer.  Market allocation is also a *per se* violation of the antitrust laws.

374.   Courts have determined that *per se* practices have no legitimate justification and lack any redeeming competitive purpose so should be considered

147

unlawful without any further analysis of their effects, reasonableness or economic justifications.

375. Defendants and their co-conspirators agreed to actions that had the effect of fixing the prices of and rigging bids and allocating markets for Auto Parts. The collusive schemes inflated the prices of Auto Parts, and GEICO paid more for these parts than it would have otherwise in the absence of the conspiracies. On May 25, 2014, news sources reported that Brent Snyder, a Deputy Assistant Attorney General in DOJ's Antitrust Division, stated that "[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of [these] conspiracy[ies]."

376. Because price fixing, bid rigging and market allocation are presumptively unlawful under the antitrust laws, GEICO does not shoulder the burden of defining relevant markets or showing anticompetitive effects. *Per se* violations of the antitrust laws lack redeeming value and cannot be justified.

## VI.   GEICO Suffered Antitrust Injury

377. The Defendants' bid rigging, market allocation and price-fixing conspiracies had the following effects, among others:

(a)   The prices of Auto Parts have been fixed, raised, maintained or stabilized at artificially inflated levels; and

(b)     Price competition has been restrained or eliminated with respect to Auto Parts.

378.   Auto Parts manufacturers illegally charge supra-competitive prices for Auto Parts to repair professionals, OEMs and automotive dealers.  By artificially and illegally inflating the prices charged to automobile manufacturers, Defendants also increased the price of parts sold to repair professionals, since the price of parts in the aftermarket is based on the price charged to automobile manufacturers. Repair professionals when repairing a GEICO insured or claimant's Motor Vehicle benefitted from Auto Parts manufacturers' illegal conduct, as did the Auto  Parts manufacturers, to the detriment of GEICO.  Only after an estimate understanding is reached whereby GEICO agrees to reimburse the insured for the insured or claimant's repair, and the insured or claimant instructs the repair professional to commence repairs, does the repair professional order the illegally inflated priced Auto  Part.  At that time, both the price paid for ordering the Auto Part and the price charged in the estimate are set, and the spread (i.e. the repair professionals' profit tied to the Auto Part) between these two prices is set by percentage and is larger than it would have been had Auto Parts manufacturers not illegally inflated the prices of Auto Parts.  Repair professionals then invoice—itemizing the Auto Parts' charges—the estimated price (which is higher because of the Auto Parts manufacturers' illegal conduct) to the insureds and claimants as well as to GEICO.

149

Because of the way Auto Parts are always charged to auto insurers, the invoiced/estimated price contains 100% of the illegal overcharge plus a percentage of the repair professionals' profits caused by the illegally inflated prices. When GEICO reimburses an insured or claimant for the repair cost based on the estimated and invoiced price for Auto Parts charged by repair professionals — whether or not the insureds or claimants repaired the Motor Vehicle—GEICO pays 100% of the illegally inflated price for the Auto Part plus an illegally inflated spread or profit for the repair professionals.

379.    GEICO's injuries in the form of higher reimbursements for illegally inflated Auto Parts extends to non-OEM Auto Parts and OEM Auto Parts on which the Auto Parts manufacturers did not conspire in violation of the law. The Auto Parts manufacturers' illegal conduct caused these two categories of Auto Parts to also be illegally inflated whereby GEICO pays 100% of the illegally inflated price for the Auto Part plus an illegally inflated spread or profit for the repair professionals.

380.   OEMs and automotive dealers also pass along Auto Parts manufacturers' illegally inflated prices to GEICO. When a Motor Vehicle is declared a total loss, GEICO pays the insured or claimant for the value of the Motor Vehicle. OEMs pass along the overcharges they pay for Auto Parts through

150

the price of the Motor Vehicle.  GEICO thus reimburses insureds and claimants for a Motor Vehicle price that has been inflated by the component Auto Parts.

381.   GEICO also purchases fleet Motor Vehicles directly from OEMs.  For GEICO's fleet purchases, GEICO is similarly situated to other Motor Vehicle purchasers that were part of the End-Payor Plaintiff class.  OEMs charge higher prices for the Motor Vehicles because of the unlawful manipulation of Auto Parts prices, and GEICO consequently paid illegally inflated prices for the fleet Motor Vehicles that the OEM passed on to GEICO.

382.   The potential submarkets at issue in this case are inextricably linked and intertwined.  The individual Auto Parts Submarkets and the market for Motor Vehicles are inextricably linked and intertwined because the Auto Parts submarkets exist to serve the Motor Vehicle market.  Without the Motor Vehicles, Auto Parts have little to no value because they have no independent utility. Auto Parts are a critical and necessary input to a finished Motor Vehicle, and Motor Vehicles similarly have little value without their component parts. Because Auto Parts are a necessary input to a finished Motor Vehicle, demand for Motor Vehicles drives demand for Auto Parts.  GEICO participated in the Auto Parts Submarkets and the Motor Vehicle market when it (a) paid repair professionals and shops directly for Auto Parts for insureds or claimants' Motor Vehicles; (b) reimbursed insureds and claimants for the price of Auto Parts; (c) reimbursed

insureds and claimants' for the Motor Vehicle value when a Motor Vehicle is declared a total loss; and (d) purchased new Motor Vehicles and replacement Auto Parts for its fleet program.

383.   To the extent there exists an insurance submarket, or variant thereof, it too is inextricably intertwined with the Motor Vehicle submarket and Auto Parts Submarket.  The submarkets for Auto Parts and insurance coverage exist only to serve the Motor Vehicle market.  There would not be a market demand for Motor Vehicles in the United States if insurance coverage did not exist under current state regulatory regimes.   Because owners must insure their Motor Vehicles under applicable state laws and regulations, individuals and businesses would not purchase Motor Vehicles from OEMs and auto dealers if they could not obtain insurance.  As a result, if insurance coverage did not exist, Motor Vehicle demand in the United States under current laws would effectively dissipate, taking any demand for Auto Parts in the United States with it.  GEICO, as one of the nation's leading insurers, participates and has participated in any insurance submarket, and, consequently, participates in the corresponding Motor Vehicle market and Auto Parts Submarkets.  The Defendants utilized GEICO and other insurers as a fulcrum to injure purchasers in the Motor Vehicle market and Auto Parts submarkets by relying on the existence of insurance coverage—and thus the ability to sell its

152

Motor Vehicles in the United States—to injure purchasers through the unlawful manipulation of Auto Parts prices.

384.   Auto Parts are identifiable, discrete physical products and are separate from the Motor Vehicle in which they are installed.  Auto Parts do not change form or become an indistinguishable part from the Motor Vehicle in which they are installed.  As a result, Auto Parts may be traced through the chain of distribution—fully invoiced by Auto Part and the price—and through the manufacture of the Motor Vehicle.  Because Auto Parts are discrete products, the cost and price of Auto Parts—and any price changes—also may be traced.

385.   Price changes in an Auto Part impact the overall price and value of the Motor Vehicle.   Increases in the price of component Auto Parts lead to corresponding price increases in the price of new Motor Vehicles at the OEM and automotive dealer level.   OEMs and dealers have thin margins, and these downstream distribution markets in which Motor Vehicles are sold are consequently highly competitive.  OEMs and dealers pass on any overcharges they incur from Auto Part suppliers to consumers, including to GEICO and its  insureds and claimants, as detailed *supra*.  Inflated prices charged to OEMs, impacts pricing in the aftermarket.  As a result, GEICO paid artificially inflated prices for Auto Parts when it reimbursed its insureds or claimants for a Motor Vehicle's value or purchased Motor Vehicles for its fleet.

153

386.   The purpose of Defendants and their co-conspirators anticompetitive conduct was to raise, fix, maintain or stabilize the price of Auto Parts purchased for repair purposes.

387.   GEICO was overcharged for its purchase and reimbursement of replacement Auto Parts, the value of Motor Vehicles declared a total loss and the purchase of fleet Motor Vehicles. Those overcharges have unjustly enriched Defendants.

388.   The precise amount of the overcharges impacting the prices of new Motor Vehicles containing Auto Parts and of replacement parts can be measured and quantified.  Commonly used and well-accepted economic models may be used to measure both the extent and the amount of the supra-competitive prices passed through the distribution chain to GEICO.  Thus, the economic harm to GEICO can be quantified.  By reason of the alleged violations of the antitrust laws, GEICO has sustained injury to its businesses or property, having paid higher prices for Auto Parts than it would have paid in the absence of the Defendants' illegal agreements, combinations or conspiracies, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    GEICO Was Not on Notice of Its Claims

### A.    *GEICO Could Not Have Discovered Its Claims Until the DOJ Guilty Plea Announcements*

389.    GEICO repeats and re-alleges the allegations set forth above.

390.    GEICO had no knowledge of the combinations or conspiracies alleged herein, or of facts sufficient to place it on inquiry notice of the claims set forth herein.  The earliest GEICO could have become aware of a specific Auto Part conspiracy involving a specific Defendant was when the DOJ or other foreign competition authority announced that the particular Defendant had pled guilty to participating in a conspiracy for that particular part.

391.    As an insurer who purchases replacement parts directly from repair professionals and reimburses its insureds and claimants for their purchase of replacement parts, GEICO has no direct contact or interaction with the Defendants and had no means from which it could have discovered the combinations and conspiracies described in this Complaint before the public announcements of the specific Auto Part government investigations.

392.    No information in the public domain was available to GEICO to know a Defendant was involved in a particular Auto Part conspiracy prior to the DOJ announcing that a particular Defendant had pled guilty to its involvement in a conspiracy to rig bids and fix the prices of a specific Auto Part.  Because of the

lack of information in the public domain, GEICO did not have sufficient information to suggest that the Defendants were involved in criminal conspiracies to fix the price of Auto Parts, rig bids and allocate markets.  GEICO had no means of obtaining (a) any facts or information concerning any aspect of the Defendants' dealings with repair professionals; (b) facts concerning Defendants and their co-conspirators' agreements and conspiracies alleged herein and (c) facts evidencing the scope of DOJ and other governments' investigations and specific Auto Parts implicated.

393.  For these reasons, the statutes of limitations as to GEICO's claims did not begin to run, at the earliest, until the DOJ publicly announced that a particular Defendant had pled guilty for its participation in a conspiracy specific as to a Auto Part.  Additionally, there may be other reasons why the statute of limitations periods did not commence running or were tolled as to GEICO.

## B.     *Defendants Committed Continuing Antitrust Violations*

394.  GEICO purchased or reimbursed its insureds and claimants for replacement Auto Parts hundreds of thousands, if not millions, of times during the Relevant Time Periods.  The Defendants committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to an OEM or repair professional who then sold and/or installed the part in a GEICO Motor Vehicle or an insured or claimant's Motor Vehicle.  Because the OEMs and repair professional pass on the

overcharges they incurred in the purchase of parts from the Defendants, each Auto Part sale from a Defendant to an OEM or repair professional—followed by a sale to one of GEICO's insureds or claimants or GEICO itself for its fleet—resulted in an overcharge and injury to GEICO.

395. GEICO also reimbursed insureds and claimants for the full value of Motor Vehicles in the event of a total loss during the Relevant Time Periods. The Defendants committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to an OEM, which then installed the part in a Motor Vehicle sold to a GEICO insured or claimant. Each Auto Part sale from a Defendant to an OEM—which was then installed in an insured, claimant or GEICO Motor Vehicle—resulted in an overcharge and injury to GEICO.

396. GEICO purchased new Motor Vehicles as part of its fleet program— and parts for these Motor Vehicles—during the Relevant Time Periods. The Defendants committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to an OEM, which then installed the part in a Motor Vehicle sold to GEICO. The Defendants also committed an overt act in furtherance of the conspiracies each time they sold an Auto Part to a repair professional who then sold and/or installed the part in a GEICO fleet Motor Vehicle. Each Auto Part sale from a Defendant to an OEM or repair professional—followed by a sale to GEICO—resulted in an overcharge and injury to GEICO.

157

397.   For each overcharge and injury to GEICO, a cause of action accrued, restarting the relevant statute of limitations. At the earliest, each Defendant committed its last overt acts in furtherance of the various conspiracies beginning on the date the DOJ announced a particular Defendant entered a guilty plea as to a specific Auto Part, and the relevant statutes of limitations for each Auto Part alleged thus begin from the date of the last overt acts.

398.   The continuing violation doctrine frequently arises in conspiracy cases because each price increase requires further collusion among the Defendants. Defendants were engaged in ongoing conspiracies, and each price increase resulted from additional collusion between and among the Defendants.

### C.    Defendants    Fraudulently    Concealed    Their    Illegal Conspiracies

399.   Defendants and their co-conspirators took active steps to conceal their wrongdoing, and GEICO did not discover, and could not have discovered, through the exercise of reasonable diligence the existence of Defendants' conspiracies until, at the earliest, the DOJ announced that the particular defendant pled guilty to a Sherman Act Section 1 violation for a particular Auto Part.  For those Defendants who have not yet pled guilty, the conspiratorial conduct, or at least its effects, may still continue.  The U.S. DOJ continues to announce investigations and plea deals for Auto Parts.

400. Before the DOJ announced that a particular Defendant had pled guilty on a specific part, GEICO was unaware of the unlawful conduct, and did not realize it was paying supra-competitive prices for Auto Parts throughout the United States during the Relevant Time Periods. And even with the DOJ announcements, GEICO still did not have sufficient information to assess the scope and magnitude of the conspiracies and unlawful conduct. No information, actual or constructive, was ever made available to GEICO that revealed the Defendants' price-fixing, bid rigging and market allocation conspiracies.

401. Defendants' anticompetitive conspiracies and unlawful combinations were inherently self-concealing. Defendants and their co-conspirators met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs, repair professionals and other direct and indirect purchasers. Defendants often instructed recipients of their written email communications detailing their unlawful agreements to each other and internally to "destroy after reading." Defendants also engaged in other surreptitious activity, including the use of code names and meeting at private residences or remote locations. The conspirators coordinated their pricing in a manner to avoid detection by the OEMs or repair professionals.

402. Because the alleged conspiracies were both self-concealing and affirmatively concealed by Defendants and their co-conspirators, a reasonable

person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Auto Parts prices before the Department of Justice announced that a specific Defendant had pled guilty on a specific Auto Part, at the earliest. GEICO specifically had no knowledge of the alleged conspiracies, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until the DOJ announced the guilty pleas and further information subsequently became public.

403. For these reasons, the statutes of limitations applicable to GEICO's claims were tolled and did not begin to run until the DOJ publically announced its investigation into each Auto Part challenged herein.

### D. GEICO's Claims Were Tolled by the Class Complaints in the Auto Parts MDL

404. GEICO's claims were also tolled during the pendency of the class action suits in *In re Auto Parts Antitrust Litigation*, MDL No. 2311, under the U.S. Supreme Court's decisions in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983). GEICO was a putative member of the proposed classes for the following relevant proposed (and Settlement) Auto Parts Classes: Access Mechanisms, Air Conditioning Systems, Air Fuel Ratio Sensors, Anti-Vibrational Rubber Parts, ATF Warmers and Oil Coolers, Automotive Bearings, Automotive Brake Hoses,

Automotive Constant-Velocity-Joint Boot Products, Automotive Lamps, Automotive Steel Tubes, Automotive Wire Harness Systems, Body Sealings, Ceramic Substrates, Electric Powered Steering Assemblies, Exhaust Systems, Fan Motors, Fuel Injection Systems, Heater Control Panels, High Intensity Discharge Ballasts, Ignition Coils, Instrument Panel Clusters, Interior Trim Products, Power Window Motors, Radiators, Shock Absorbers, Side Door Latches and Latch Minimodules, Spark Plugs, Starters, Windshield Washer Systems, and Windshield Wiper Systems. The Auto Parts class cases were consolidated into the *In re Auto Parts Antitrust Litigation*, MDL No. 2311. GEICO's claims were thus tolled from the filing of the class suits until GEICO opted out of the litigation on July 13, 2018.

## VIII.  GEICO Paid Illegal, Supra-Competitive Prices for Auto Parts

405.   During the Relevant Time Periods, GEICO purchased or reimbursed its insureds and claimants for Auto Parts in amounts exceeding $4.8 billion, including:

(a)    During the Access Mechanisms Relevant Time Period, GEICO paid approximately $117 million in supra-competitive prices for Access Mechanisms.

(b)     During the Air Conditioning Systems Relevant Time Period, GEICO paid approximately $360 million in supra-competitive prices for Air Conditioning Systems.

(c)     During the Air Fuel Ratio Sensors Relevant Time Period, GEICO paid approximately $2.8 million in supra-competitive prices for Air Fuel Ratio Sensors.

(d)     During the Anti-Vibrational Rubber Parts Relevant Time Period, GEICO paid approximately $20 million in supra-competitive prices for Anti-Vibrational Rubber Parts.

(e)     During the ATF Warmers and Oil Coolers Relevant Time Period, GEICO paid approximately $45 million in supra-competitive prices for ATF Warmers and Oil Coolers.

(f)     During the Automotive Bearings Relevant Time Period, GEICO paid approximately $56 million in supra-competitive prices for Bearings.

(g)     During the Automotive Brake Hoses Relevant Time Period, GEICO paid approximately $2 million in supra-competitive prices for Automotive Hoses.

(h)     During the Automotive Constant-Velocity-Joint Boot Products Relevant Time Period, GEICO paid approximately $550 thousand in supra-competitive prices for Automotive Constant-Velocity-Joint Boot Products.

162

(i)     During the Automotive Lamps Relevant Time Period, GEICO paid approximately $2.4 billion in supra-competitive prices for Automotive Lamps.

(j)     During the Automotive Steel Tubes Relevant Time Period, GEICO paid approximately $253 million in supra-competitive prices for Automotive Steel Tubes.

(k)     During the Automotive Wire Harness Systems Relevant Time Period, GEICO paid approximately $13.8 million in supra-competitive prices for Automotive Wire Harness Systems.

(l)     During the Body Sealings Relevant Time Period, GEICO paid approximately $11 million in supra-competitive prices for Body Sealings.

(m)     During the Ceramic Substrates Relevant Time Period, GEICO paid approximately $56.8 million in supra-competitive prices for Ceramic Substrates.

(n)     During the Electric Powered Steering Assemblies Relevant Time Period, GEICO paid approximately $470 thousand in supra-competitive prices for Electric Powered Steering Assemblies.

(o)     During the Exhaust Systems Relevant Time Period, GEICO paid approximately $326 million in supra-competitive prices for Exhaust Systems.

163

(p)     During the Fan Motors Relevant Time Period, GEICO paid approximately $15 million in supra-competitive prices for Fan Motors.

(q)     During the Fuel Injection Systems Relevant Time Period, GEICO paid approximately $9.5 million in supra-competitive prices for Fuel Injection Systems.

(r)     During the Heater Control Panels Relevant Time Period, GEICO paid approximately $2 million in supra-competitive prices for Heater Control Panels.

(s)     During the HID Ballasts Relevant Time Period, GEICO paid approximately $1.8 million in supra-competitive prices for High Intensity Discharge Ballasts.

(t)     During the Ignition Coils Relevant Time Period, GEICO paid approximately $755 thousand in supra-competitive prices for Ignition Coils.

(u)     During the Instrument Panel Clusters Relevant Time Period, GEICO paid approximately $65 million in supra-competitive prices for Instrument Panel Clusters.

(v)     During the Interior Trim Products Relevant Time Period, GEICO paid approximately $549 million in supra-competitive prices for Interior Trim Products.

(w)     During the Power Window Motors Relevant Time Period, GEICO paid approximately $1.6 million in supra-competitive prices for Power Window Motors.

(x)     During the Radiators Relevant Time Period, GEICO paid approximately $264 million in supra-competitive prices for Radiators.

(y)     During the Shock Absorbers Relevant Time Period, GEICO paid approximately $31 million in supra-competitive prices for Shock Absorbers.

(z)     During the Side Door Latches Relevant Time Period, GEICO paid approximately $1.4 million in supra-competitive prices for Side Door Latches and Latch Minimodules.

(aa)    During the Spark Plugs Relevant Time Period, GEICO paid approximately $482 thousand in supra-competitive prices for Spark Plugs.

(bb)    During the Starters Relevant Time Period, GEICO paid approximately $2.8 million in supra-competitive prices for Starters.

(cc)    During the Windshield Washer Systems Relevant Time Period, GEICO paid approximately $63 million in supra-competitive prices for Windshield Washer Systems.

(dd)    During the Windshield Wiper Systems Relevant Time Period, GEICO paid approximately $69 million in supra-competitive prices for Windshield Wiper Systems.

165

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act

406.  GEICO incorporates by reference the allegations in the preceding paragraphs.

407.  Defendants and unnamed conspirators entered into and engaged in contracts, combinations or conspiracies that unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

408.  The acts committed by each of the Defendants as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered or committed by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

409.  During the Relevant Time Periods, Defendants and their co-conspirators entered into continuing agreements, understandings and conspiracies in restraint of trade to artificially fix, raise, stabilize and control prices for Auto Parts. Agreements to fix prices, rig bids and allocate markets are *per se* violations of the Sherman Act and presumptively anticompetitive.  The conspiratorial acts and combinations have unreasonably restrained competition in the Auto Parts Submarkets.

410.  The anticompetitive acts were intentionally directed at the United States Auto Parts Submarkets and had a substantial and foreseeable effect on

166

interstate commerce by raising and fixing prices of Auto Parts throughout the United States.

411.   As a result of Defendants' unlawful conduct, GEICO has been injured in its business or property because it paid—either directly or through reimbursement to its insureds or claimants—inflated, supra-competitive prices for Auto Parts and Motor Vehicles declared a total loss.  GEICO paid more than it would have paid for Auto Parts and Motor Vehicles in the absence of the conspiracies.  GEICO's injuries flow directly from Defendants' anticompetitive price-fixing, bid-rigging and market allocation conspiracies, as Defendants conspired to fix prices for Auto Parts and then charged repair professionals, OEMs and automotive dealers supra-competitive, fixed prices for the replacement and new parts.  The OEMs, repair professionals and automotive dealers passed on these inflated, supra-competitive prices to GEICO and their insureds and claimants. GEICO's injuries are the type that the antitrust laws were intended to prevent.

412.   Defendants and their co-conspirators' conspiracies had the following effects on the relevant Auto Parts Submarkets:

(a)     Prices for Auto Parts sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States;

167

(b)     Price competition has been restrained, suppressed and/or eliminated in the United States;

(c)     Defendants' conspiracies also have decreased innovation and quality in the Auto Parts Submarkets; and

(d)     GEICO, repair professionals, OEMs, automotive dealers and consumers (including GEICO's insureds or claimants) have been deprived of the benefits of free and open competition in the Auto Parts Submarkets and have paid supra-competitive prices.

413.   GEICO is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes

414.   GEICO incorporates and realleges, as though fully set forth herein, the allegations in Paragraphs 1-405 of this Complaint.

415.   During the Relevant Time Periods, Defendants and their co-conspirators engaged in continuing contracts, combinations or conspiracies with respect to the price of Auto Parts. Defendants and their co-conspirators' agreements and conspiracies unreasonably restrained trade and commerce in violation of various state antitrust and other statutes described below.

416. Defendants and their co-conspirators agreed to fix, raise, inflate, stabilize and/or maintain artificially supra-competitive prices for Auto Parts, to rig bids and to allocate markets for Auto Parts in the United States.

417. In formulating and effectuating these conspiracies, Defendants and their co-conspirators performed acts in furtherance of these agreements and conspiracies, including:

(a)     participating in secret meetings and conversations among themselves in the United States and elsewhere during which they agreed (i) to price Auto Parts at certain levels, and otherwise to fix, increase, inflate, maintain or stabilize effective prices paid by repair professionals, OEMs and automotive dealers—and subsequently GEICO—with respect to Auto Parts sold in the United States; (ii) to rig bids for Auto Parts; and (iii) to allocate customers and markets for Auto Parts in the United States in furtherance of their conspiracies; and

(b)     participating in secret meetings and conversations among themselves in the United States and elsewhere to implement, adhere to and police the unlawful price-fixing, bid-rigging and market allocation conspiracies.

418. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain,

169

increase or stabilize prices, to rig bids and to allocate markets with respect to Auto Parts.

419.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

420.   Defendants and their co-conspirators have knowingly agreed and entered combinations to fix Auto Parts prices and unlawfully restrain trade in violation of Alabama Code §§ 8-10-1, et seq.

(a)   GEICO purchased and paid for Auto Parts sold by repair professionals located in Alabama.  GEICO also reimbursed insureds or claimants residing in Alabama for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Alabama.

(b)   Defendants' agreements, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Alabama; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Alabama; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts in Alabama.

170

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected Alabama commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' agreements and combinations unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Alabama Code §§ 8-10-1, et seq.  Accordingly, GEICO seeks all forms of relief available under Alabama Code §§ 8-10-1, et seq. and § 6-5-60.

421.   Defendants and their co-conspirators entered contracts, combinations and/or conspiracies to restrain trade in violation of the Arizona Revised Statutes §§ 44-1401, et seq.

(a)     In Alabama, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Arizona.   GEICO also reimbursed insureds or claimants residing in Arizona for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Arizona.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels

171

throughout Arizona; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Arizona; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Arizona.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected Arizona commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' agreements and combinations unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401, et seq. Accordingly, GEICO seeks all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, et seq.

422.   Defendants and their co-conspirators have entered into trusts to restrict trade and fix prices in violation of the California Business and Professions Code §§ 16700, et seq.

(a)     In California, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii)   Auto Parts sold by repair professionals located in California.   GEICO also reimbursed insureds or

172

claimants residing in California for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in California.

(b)     Defendants and their co-conspirators combined their capital and skill, as well as acted, for the purpose of restricting trade or commerce in California and fixing prices.   Defendants and their co-conspirators also entered into and carried out their contracts and agreements with the purpose of establishing and keeping the price of Auto Parts at a fixed level in an effort to preclude free competition in the sale of Auto Parts in California.

(c)     Defendants' contracts (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout California; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout California; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in California.

(d)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected California commerce.

(e)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(f)     Defendants' contracts unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of California Business and Professions Code, § 16720.  Accordingly, GEICO seeks all forms of relief available under California Business and Professions Code §§ 16750.

423. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade within the District of Columbia in violation of the District of Columbia Code §§ 28-4501, et seq.

(a)     In the District of Columbia, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in District of Columbia.  GEICO also reimbursed insureds or claimants residing in District of Columbia for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in District of Columbia.  For Motor Vehicles declared a total loss, GEICO paid insureds or claimants residing in District of Columbia the value of their Motor Vehicle at the time of loss.

174

(b)    GEICO Indemnity Company, GEICO Casualty Company, GEICO Advantage Insurance Company, GEICO Choice Insurance Company and GEICO Secure Insurance Company have their principal place of business in Washington, DC.

(c)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout the District of Columbia; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout the District of Columbia; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in District of Columbia.

(d)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

(e)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

 (f)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of the District of Columbia Code, §§ 28-4501, et seq.

175

Accordingly, GEICO seeks all forms of relief available under District of Columbia Code, §§ 28-4501, et seq.

424. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade within Hawaii in violation of the Hawaii Revised Statutes §§ 480-1, et seq.

(a)     In Hawaii, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Hawaii.  GEICO also reimbursed insureds or claimants residing in Hawaii for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Hawaii.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Hawaii; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Hawaii; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Hawaii.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Hawaii.

176

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Hawaii Revised Statutes §§ 480-1, et seq.  Accordingly, GEICO seeks all forms of relief available under Hawaii Revised Statutes §§ 480-1, et seq.

425.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to unreasonably restrain trade in violation of Illinois Compiled Statutes 740 §§ 10/1, et seq.

(a)    In Illinois, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Illinois.  GEICO also reimbursed insureds or claimants residing in Illinois for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Illinois.

(b)    Defendants entered contracts and engaged in combinations and conspiracies with its competitors for the purpose of fixing prices, rigging bids and allocating markets, which are unreasonable restraints of trade.

177

(c) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Illinois; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Illinois; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Illinois.

(d) During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Illinois.

(e) As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(f) Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Illinois Compiled Statutes 740 §§ 10/1, et seq. Accordingly, GEICO seeks all forms of relief available under Illinois Compiled Statutes 740 §§ 10/1, et seq.

426. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of the Iowa Code §§ 553.1, et seq.

178

(a)    In Iowa, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Iowa.  GEICO also reimbursed insureds or claimants residing in Iowa for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Iowa.

(b)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Iowa; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Iowa; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Iowa.

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Iowa.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in

179

violation of Iowa Code, §§ 553.1, et seq. Accordingly, GEICO seeks all forms of relief available under Iowa Code §§ 553.1, et seq.

427. Defendants and their co-conspirators entered a trust to restrain trade in violation of the Kansas Statutes §§ 50-101, et seq.

(a) In Kansas, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Kansas. GEICO also reimbursed insureds or claimants residing in Kansas for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Kansas.

(b) Defendants combined their capital, skill and acts for the purpose of restricting trade, increasing the price of Auto Parts, and preventing competition in the sale of Auto Parts. Defendants also made and entered into contracts and agreements to fix and keep the price of Auto Parts at a fixed level, thereby precluding free and unrestricted competition.

(c) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Kansas; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Kansas; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts

180

Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Kansas.

(d)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Kansas.

(e)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(f)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Kansas Statutes §§ 50-101, et seq.  Accordingly, GEICO seeks all forms of relief available under Kansas Statutes §§ 50-101, et seq.

428.    Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in Maine in violation of Maine Revised Statutes §§ 1101, et seq.

(a)    In Maine, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Maine.  GEICO also reimbursed insureds or claimants residing in Maine for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Maine.

181

(b)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Maine; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Maine; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Maine.

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Maine.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Maine Revised Statutes §§ 1101, et seq.  Accordingly, GEICO seeks all forms of relief available under Maine Revised Statutes §§ 1101, et seq.

429. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Michigan Compiled Laws §§ 445.771, et seq.

182

(a)     In Michigan, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Michigan.  GEICO also reimbursed insureds or claimants residing in Michigan for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Michigan.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Michigan; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Michigan; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Michigan.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Michigan.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in

183

violation of Michigan Compiled Laws §§ 445.771, et seq.  Accordingly, GEICO seeks all forms of relief available under Michigan Compiled Laws §§ 445.771, et seq. and 445.778.

430. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Minnesota Statutes §§ 325D.49, et seq.

(a)    In Minnesota, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Minnesota.  GEICO also reimbursed insureds or claimants residing in Minnesota for their purchase of Auto Parts or the value of the Motor Vehicle or parts written on an estimate prepared by a repair professional in Minnesota.

(b) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Minnesota; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Minnesota; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Minnesota.

184

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Minnesota.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Minnesota Statutes §§ 325D.49, et seq. Accordingly, GEICO seeks all forms of relief available under Minnesota Statutes §§ 325D.49, et seq.

431.  Defendants and their co-conspirators agreed and entered into combinations and contracts to restrain trade in violation of Mississippi Code §§ 75-21-1, et seq.

(a)    In Mississippi, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Mississippi. GEICO also reimbursed insureds or claimants residing in Mississippi for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in District of Columbia.

185

(b)    Defendants' agreements, combinations and/or contracts had the effect of (i) fixing, raising, maintaining and stabilizing Auto Parts prices at artificially high levels throughout Mississippi; (ii) restraining, suppressing and eliminating price competition for Auto Parts throughout Mississippi; (iii) depriving GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulting in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Mississippi.

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Mississippi.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts, combinations and agreements unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Mississippi Code §§ 75-21-1, et seq.  Accordingly, GEICO seeks all forms of relief available under Mississippi Code §§ 75-21-1, et seq.

432. Defendants and their co-conspirators agreed and entered into combinations and contracts to restrain trade in violation of Nebraska Statutes §§ 59-801, et seq.

186

(a)    In Nebraska, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Nebraska.  GEICO also reimbursed insureds or claimants residing in Nebraska for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Nebraska.

(b)    Defendants' contracts and combinations (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Nebraska; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Nebraska; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Nebraska.

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Nebraska.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)    Defendants' contracts and combinations unlawfully fixed Auto Parts prices, allocated markets and restrained trade in violation of Nebraska

187

Statutes §§ 59-801, et seq. Accordingly, GEICO seeks all forms of relief available under Nebraska Statutes §§ 59-801, et seq.

433. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Nevada Revised Statutes §§ 598A.010, et seq.

(a) In Nevada, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Nevada. GEICO also reimbursed insureds or claimants residing in Nevada for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Nevada.

(b) Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Nevada; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Nevada; (iii) rigged bids; (iv) allocated markets; (v) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (vi) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Nevada.

188

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Nevada.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Nevada Revised Statutes §§ 598A.010, et seq. Accordingly, GEICO seeks all forms of relief available under Nevada Revised Statutes §§ 598A.010, et seq.

434.   Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of New Hampshire Revised Statutes §§ 356:1, et seq.

(a)     In New Hampshire, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in New Hampshire. GEICO also reimbursed insureds or claimants residing in New Hampshire for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in New Hampshire.

189

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout New Hampshire; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout New Hampshire; (iii) rigged bids; (iv) allocated markets; (v) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (vi) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in New Hampshire.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in New Hampshire.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, et seq. Accordingly, GEICO seeks all forms of relief available under New Hampshire Revised Statutes §§ 356:1, et seq.

435. Defendants and their co-conspirators entered into contracts, agreements, combinations and/or conspiracies to restrain trade in New Mexico in violation of New Mexico Statutes §§ 57-1-1, et seq.

(a)     In New Mexico, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in New Mexico.  GEICO also reimbursed insureds or claimants residing in New Mexico for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in New Mexico.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout New Mexico; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout New Mexico; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in New Mexico.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in New Mexico.

191

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of New Mexico Statutes §§ 57-1-1, et seq.  Accordingly, GEICO seeks all forms of relief available under New Mexico Statutes §§ 57-1-1, et seq.

436. Defendants and their co-conspirators entered into contracts, agreements and/or combinations to restrain trade and competition in violation of New York Gen. Bus. Code §§ 340, et seq.

(a)     In New York, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in New York.  GEICO also reimbursed insureds or claimants residing in New York for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in New York.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout New York; (ii) restrained, suppressed and eliminated price

192

competition for Auto Parts throughout New York; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in New York.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in New York.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of New York Gen. Bus. Code §§ 340, et seq.  Accordingly, GEICO seeks all forms of relief available under New York Gen. Bus. Code §§ 340, et seq.

437. Defendants and their co-conspirators entered into contracts, combinations and/or conspiracies to restrain trade in North Carolina in violation of North Carolina General Statutes §§ 75-1, et seq.

(a)     GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in North Carolina.  GEICO also reimbursed insureds or claimants residing in

North Carolina for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in North Carolina.

(b)      Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout North Carolina; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout North Carolina; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in North Carolina.

(c)      During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in North Carolina.

(d)      As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)      Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of North Carolina General Statutes §§ 75-1, et seq.  Accordingly, GEICO seeks all forms of relief available under North Carolina General Statutes §§ 75-1, et seq.

194

438. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of North Dakota Century Code §§ 51-08.1-01, et seq.

(a)     In North Dakota, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in North Dakota. GEICO also reimbursed insureds or claimants residing in North Dakota for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in North Dakota.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout North Dakota; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout North Dakota; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in North Dakota.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in North Dakota.

(d)  As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)  Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, et seq. Accordingly, GEICO seeks all forms of relief available under North Dakota Century Code §§ 51-08.1-01, et seq.

439.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in violation of Oregon Revised Statutes §§ 646.705, et seq.

(a)  In Oregon, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Oregon. GEICO also reimbursed insureds or claimants residing in Oregon for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Oregon.

(b)  Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Oregon; (ii) restrained, suppressed and eliminated price

196

competition for Auto Parts throughout Oregon; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Oregon.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Oregon.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Oregon Revised Statutes §§ 646.705, et seq.   Accordingly, GEICO seeks all forms of relief available under Oregon Revised Statutes §§ 646.705, et seq.

440.   Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain trade in South Dakota in violation of South Dakota Codified Laws §§ 37-1-3.1, et seq.

(a)     In South Dakota, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in South Dakota.  GEICO also reimbursed insureds or

claimants residing in South Dakota for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in South Dakota.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout South Dakota; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout South Dakota; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in South Dakota.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in South Dakota.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, et seq.  Accordingly, GEICO seeks all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, et seq.

198

441. Defendants and their co-conspirators entered into contracts, agreements, trusts and/or combinations to restrain competition in violation of Tennessee Code §§ 47-25-101, et seq.

(a)     In Tennessee, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Tennessee.  GEICO also reimbursed insureds or claimants residing in Tennessee for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Tennessee.

(b)     Defendants' contracts, combinations, agreements and/or trusts (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Tennessee; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Tennessee; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Tennessee.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Tennessee.

(d)   As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)   Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Tennessee Code §§ 47-25-101, et seq.  Accordingly, GEICO seeks all forms of relief available under Tennessee Code §§ 47-25-101, et seq.

442.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of Utah Code §§ 76-10-3101, et seq.

(a)   GEICO regularly conducts business in and is subject to the protections of the laws of the state of Utah.  It has capacity to sue and be sued in Utah by virtue of its "minimum contacts" in Utah. GEICO is an insurance company approved to conduct business by the Utah Insurance Department, with physical offices in Utah.

(b)   In Utah, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Utah.  GEICO also reimbursed insureds or claimants residing in

200

Utah for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Utah.

(c)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Utah; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Utah; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Utah.

(d)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Utah.

(e)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(f)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Utah Code §§ 76-10-3101, et seq.  Accordingly, GEICO seeks all forms of relief available under Utah Code §§ 76-10-3101, et seq.

443. Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of Vermont Statutes 9 §§ 2453, et seq.

(a)    In Vermont, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Vermont.  GEICO also reimbursed insureds or claimants residing in Vermont for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Vermont.

(b)    Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Vermont; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Vermont; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Vermont; and (v) constituted an unfair method of competition.

(c)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Vermont.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants' contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Vermont Statutes 9 §§ 2453, et seq.  Accordingly, GEICO seeks all forms of relief available under Vermont Statutes 9 §§ 2453, et seq.

444.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of West Virginia Code §§ 47-18-1, et seq.

(a)     In West Virginia, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in West Virginia.  GEICO also reimbursed insureds or claimants residing in West Virginia for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in West Virginia.

(b)     Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout West Virginia; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout West Virginia; (iii) rigged bids; (iv)

203

allocated markets; (v) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (vi) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in West Virginia.

(c)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in West Virginia.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)     Defendants contracts, combinations and/or conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of West Virginia Code §§ 47-18-1, et seq.  Accordingly, GEICO seeks all forms of relief available under West Virginia Code §§ 47-18-1, et seq.

445.  Defendants and their co-conspirators agreed and entered into contracts, combinations and/or conspiracies to restrain competition in violation of Wisconsin Statutes §§ 133.01, et seq.

(a)     In Wisconsin, GEICO purchased and paid for (i) Motor Vehicles containing price-fixed Auto Parts and (ii) Auto Parts sold by repair professionals located in Wisconsin.  GEICO also reimbursed insureds or

204

claimants residing in Wisconsin for their purchase of Auto Parts or the value of the Motor Vehicle or the parts written on an estimate prepared by a repair professional in Wisconsin.

(b)      Defendants' contracts, combinations and/or conspiracies (i) fixed, raised, maintained and stabilized Auto Parts prices at artificially high levels throughout Wisconsin; (ii) restrained, suppressed and eliminated price competition for Auto Parts throughout Wisconsin; (iii) deprived GEICO and its insureds and claimants of free and open competition in the Auto Parts Submarkets; and (iv) resulted in GEICO paying supra-competitive, artificially high prices for Auto Parts and Motor Vehicles in Wisconsin.

(c)      During the Relevant Time Periods, Defendants' illegal conduct substantially affected commerce in Wisconsin.

(d)      As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured in its business and property and is threatened with further injury.

(e)      Defendants' contracts, combinations and conspiracies unlawfully fixed Auto Parts prices, rigged bids, allocated markets and restrained trade in violation of Wisconsin Statutes §§ 133.01, et seq.  Accordingly, GEICO seeks all forms of relief available under Wisconsin Statutes §§ 133.01, et seq.

205

446.   GEICO in each of the above states has been injured in its business and property by reason of Defendants' unlawful combinations, contracts, conspiracies and agreements.  GEICO has paid more for Auto Parts and Motor Vehicles than it otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

447.   In addition, Defendants have profited significantly from the described conspiracies. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of GEICO and its insureds and claimants.

448.   Accordingly, GEICO seeks damages (including statutory damages where applicable) in each of the above jurisdictions, to be trebled or otherwise increased as permitted by a particular jurisdiction's law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes

449.   GEICO incorporates and realleges, as though fully set forth herein, the allegations in Paragraphs 1-405 of this Complaint.

450.   Defendants engaged in unfair competition and unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

451.   Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Arkansas Code, § 4-88-101, et seq.

(a)   The Defendants knowingly agreed to, and did in fact, restrain trade or commerce by fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Auto Parts were sold, distributed or obtained in Arkansas and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)   Defendants' unlawful conduct constitutes deceptive and unconscionable trade practices in violation of Arkansas Code, § 4-88-107(a)(10).

(c)   Defendants' unlawful conduct had the following effects: (i) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas; (ii) Auto Parts price competition was restrained, suppressed and eliminated throughout Arkansas; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in Arkansas; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in Arkansas.

207

(d)    During the Relevant Time Periods, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, GEICO has been injured in its business and property and is threatened with further injury.

(f)    Defendants have engaged in unfair competition and unfair or deceptive acts or practices in violation of Arkansas Code, § 4-88-107(a)(10) and, accordingly, GEICO seeks all relief available under that statute.

452.   Defendants have engaged in unfair competition and unlawful, unfair and/or deceptive acts or practices in violation of California Business and Professions Code §§ 17200, et seq.

(a)    During the Relevant Time Periods, Defendants marketed, sold and/or distributed Auto Parts in California.  Vehicles containing Defendants' price-fixed Auto Parts were also sold in California.

(b)  Defendants' unlawful conduct constitutes "unfair competition" in violation of California Business and Professions Code § 17200.

(c)    Defendants' unlawful conduct had the following effects: (i) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout California; (ii) Auto Parts price competition was restrained, suppressed and eliminated throughout California; (iii) GEICO

208

was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in California; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in California.

(d)     The effects of Defendants' illegal conduct continue, and there is no indication that Defendants will cease such activity into the future.

(e)     Defendants' unlawful and unfair business practices, as described above, have caused and continue to cause GEICO to pay supra-competitive and artificially-inflated prices for Auto Parts. GEICO suffered injury-in-fact and lost money or property as a result of such unfair competition.

(f)     GEICO is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(g)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. GEICO is accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

209

453. Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.

(a)    The Defendants knowingly agreed to, and did in fact, restrain competition by fixing, controlling and/or maintaining at non-competitive and artificially inflated levels the prices at which Auto Parts were sold, distributed or obtained in Florida and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)    Defendants' unlawful conduct constitutes unfair competition as well as unconscionable, unfair and deceptive trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act.

(c)    Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout Florida; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in Florida; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in Florida.

(d)    During the Relevant Time Periods, Defendants' illegal conduct substantially affected Florida commerce and consumers.

210

(e)     As a direct and proximate result of Defendants' unlawful conduct, GEICO has been injured and is threatened with further injury.

(f)     Defendants have engaged in unfair competition and unconscionable, unfair and deceptive acts or practices in violation of Florida Stat. §§ 501.201, et seq., and, accordingly, GEICO seeks all relief available under that statute.

454.   Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of Nevada Revised Statutes §§ 598.0903, et seq.

(a)     The Defendants knowingly agreed to, and did in fact, restrain trade or commerce in Nevada by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels the prices at which Auto Parts were sold, distributed or obtained in Nevada and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constitutes deceptive trade practices in violation of Nevada Revised Statutes §§ 598.0923(3) because Defendants knowingly violated  §§ 598A.010, et seq.

(c)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout Nevada; (ii) Auto Parts prices were raised, fixed, maintained and

211

stabilized at artificially high levels throughout Nevada; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in Nevada; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in Nevada.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(e)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices in violation of Nevada Revised Statutes §§ 598.0903, et seq., and, accordingly, GEICO seeks all relief available under that statute.

455.    Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of New Hampshire Revised Statutes §§ 358-A:1, et seq.

(a)     The Defendants knowingly agreed to, and did in fact, restrain trade or commerce in New Hampshire by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels the prices at which Auto Parts were sold, distributed or obtained in New Hampshire and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constitutes unfair methods of competition and unfair and deceptive trade practices in violation of New

212

Hampshire Revised Statutes §§ 358-A:2(XIV) because Defendants priced Auto Parts in a manner that harmed competition.

(c)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout New Hampshire; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in New Hampshire; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in New Hampshire.

(d)     As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(e)     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of New Hampshire Revised Statutes §§ 358-A:1, et seq., and, accordingly, GEICO seeks all relief available under that statute.

456. Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of New Mexico Stat. §§ 57-12-1, et seq.

(a)     Defendants agreed to, and did in fact, restrain trade or commerce by affecting, fixing, controlling and/or maintaining at noncompetitive and artificially inflated levels the prices at which Auto Parts were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constitutes "unconscionable trade practices" in violation of New Mexico Stat. §§ 57-12-3 and 57-12-2, in that (i) Defendants took advantage of GEICO's lack of knowledge of what the price of Auto Parts should be in a competitive market and (ii) such conduct resulted in a gross disparity between the value received by GEICO and the prices GEICO paid for Auto Parts as set forth in N.M.S.A., § 57-12-2(E). GEICO was not aware of Defendants' price-fixing, bid-rigging and market allocation conspiracies and was therefore unaware that it was being unfairly and illegally overcharged. As indirect purchasers, GEICO paid repair professionals, or reimbursed its insureds and claimants, for Auto Parts. GEICO also purchased Motor Vehicles containing the price-fixed parts as part of its fleet program and purchased replacement parts for its fleet Motor Vehicles.  GEICO did not, and could not, directly negotiate Auto Parts prices with the Defendants. The suppression of competition that has resulted from Defendants' conspiracies has ultimately resulted in unconscionably

214

higher prices for consumers so that there was a gross disparity between the price paid and the value received for Auto Parts not only for GEICO, but also for consumers.

(c)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout New Mexico; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in New Mexico; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in New Mexico.

(d)     During the Relevant Time Periods, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, GEICO has been injured and is threatened with further injury.

(f)     Defendants have engaged in unconscionable trade practices in violation of New Mexico Stat. §§ 57-12-1, et seq., and, accordingly, GEICO seeks all relief available under that statute.

215

457. Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts and/or practices in violation of N.Y. Gen. Bus. Law § 349, et seq.

(a)    Defendants agreed to, and did in fact, restrain trade or commerce by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Auto Parts were sold, distributed or obtained in New York and took efforts to conceal their agreements from GEICO and other purchasers.

(b)    Defendants' unlawful conduct constituted consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349. Defendants' deceptive practices injured consumers and adversely impacted the public at large.

(c)    Defendants and their co-conspirators' public statements about the prices of Auto Parts omitted material information, and Defendants therefore affirmatively misrepresented the true cause of price increases for Auto Parts. Defendants alone possessed material information that was relevant to GEICO and other purchasers, but failed to provide the information. Defendants actively concealed the existence of the various Auto Parts conspiracies in New York so that New York consumers would not know that

the prices they paid were unlawfully inflated.  A reasonable consumer would have been misled by Defendants' statements as to the prices of Auto Parts.

(d)     Defendants knew that their unlawful trade practices with respect to pricing Auto Parts and concealing the existence of the conspiracies would have an impact on consumers and indirect purchasers of Auto Parts and not just the Defendants' direct customers.

(e)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout New York; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (iii) GEICO and New York consumers were deprived of free and open competition in the purchase of and reimbursement for Auto Parts in New York; and (iv) GEICO and New York consumers paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in New York.

(f)     During the Relevant Time Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Auto Parts in New York.

(g)     During the Relevant Time Periods, Defendants marketed, sold and/or distributed Auto Parts in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

217

(h)    As a direct and proximate result of the unlawful conduct of the Defendants, GEICO has been injured and is threatened with further injury.

(i)    GEICO seeks all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

458.  Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of North Carolina Gen. Stat. § 75-1.1, et seq.

(a)    Defendants agreed to, and did in fact, restrain trade and commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels the prices at which Auto Parts were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from GEICO and other purchasers.

(b)    Defendants' unlawful conduct constitutes unfair methods of competition and unfair and deceptive trade practices affecting commerce in violation of North Carolina Gen. Stat. § 75-1.1.

(c)    Defendants' price-fixing, bid-rigging and market allocation conspiracies could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing, bid-rigging and market allocation conspiracies. Defendants' public

218

statements concerning the price of Auto Parts created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracies. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracies to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of officials at each company and avoiding the creation of documents that would reveal the antitrust violations.

(d)    Defendants' conduct injured consumers and adversely impacted the North Carolina public at large.

(e)    Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout North Carolina; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in North Carolina; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in North Carolina.

(f)    During the Relevant Time Periods, each of the Defendants named herein—directly, or indirectly and through affiliates they dominated and

219

controlled—marketed, manufactured, sold and/or distributed Auto Parts in North Carolina.  Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(g)     Defendants have engaged in unfair methods of competition and unfair and deceptive trade practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, GEICO seeks all relief available under that statute.

459.  Defendants have knowingly entered into unlawful agreements in restraint of trade and commerce in violation of South Carolina Code of Laws §§ 39-5-10, et seq.

(a)     The Defendants knowingly agreed to, and did in fact, restrain trade or commerce in South Carolina by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels the prices at which Auto Parts were sold, distributed or obtained in South Carolina and undertook efforts to conceal their agreements from GEICO and other purchasers.

(b)     Defendants' unlawful conduct constituted unfair methods of competition and unfair and deceptive trade practices in violation of South Carolina Code of Laws § 39-5-10.

(c)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated

220

throughout South Carolina; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in South Carolina; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in South Carolina.

(d)    As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(e)    By reason of the foregoing, Defendants knowingly and willfully engaged in unfair competition and unfair and deceptive acts or practices, in violation of South Carolina Code of Laws §§ 39-5-10, et seq., and, accordingly, GEICO seeks all relief available under that statute.

460.  Defendants have knowingly entered into an unlawful agreement in restraint of trade and commerce in violation of 9 Vermont § 2451, et seq.

(a)    Defendants agreed to, and did in fact, restrain trade or commerce in a market that includes Vermont, by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Auto Parts were sold, distributed or obtained in Vermont.

(b)     Defendants' unlawful conduct constituted unfair methods of competition and unfair and deceptive trade practices in violation of 9 Vermont § 2453.

(c)     Defendants deliberately failed to disclose material facts to GEICO, purchasers and consumers concerning Defendants' unlawful activities and artificially inflated prices for Auto Parts.   Defendants owed a duty to disclose such facts and breached that duty. Defendants misrepresented to all consumers during the Relevant Time Periods that Defendants' Auto Parts prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects: (i) Auto Parts price competition was restrained, suppressed and eliminated throughout Vermont; (ii) Auto Parts prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (iii) GEICO was deprived of free and open competition in the purchase of and reimbursement for Auto Parts in Vermont; and (iv) GEICO paid supra-competitive, artificially inflated prices for Auto Parts and Motor Vehicles in Vermont.

(e)     As a direct and proximate result of Defendants' unlawful conduct, GEICO was injured and is threatened with further injury.

(f)     Defendants' misleading conduct constitutes unfair competition and unfair and deceptive acts or practices in violation of 9 Vermont § 2451, et seq., and, accordingly, GEICO seeks all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

461.   GEICO incorporates by reference the allegations Paragraphs 1-405 of this Complaint.

462.   GEICO brings claims for unjust enrichment in the following states: Alabama, Arizona, Arkansas, Colorado, DC, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

463.   GEICO paid inflated prices for Auto Parts, total losses and fleet Motor Vehicles because of Defendants' unlawful price-fixing, bid-rigging and market allocation conspiracies.  By paying these inflated prices for Auto Parts and Motor Vehicles, GEICO paid more for Auto Parts and Motor Vehicles than it would have in the absence of the anticompetitive conspiratorial conduct. The differential between the inflated prices and the prices in a competitive market for Auto Parts and Motor Vehicles was a benefit that GEICO conferred on Defendants.

223

Defendants received a greater benefit than they were entitled to because of their unlawful conspiracies.

464.   Defendants knew that GEICO and other purchasers were overcharged for Auto Parts and Motor Vehicles and that GEICO thus conferred a benefit on them. Defendants intentionally entered the conspiracies to induce the overpayment by GEICO and other purchasers.

465.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Auto Parts.

466.   Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by GEICO for Auto Parts and Motor Vehicles.

467.   GEICO is entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct—specifically, GEICO is entitled to the difference in (a) the inflated price it paid for an Auto Part and the price it should have paid in the absence of the unlawful conspiracies and (b) the inflated price it paid for a Motor Vehicle and the price it should have paid in the absence of the unlawful conspiracies.

468.   Pursuit of any remedies against the repair professionals from which GEICO purchased Auto Parts subject to Defendants' conspiracies would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

469.   Accordingly, GEICO respectfully requests that:

A.   The Court determine that the unlawful agreements, conspiracies and combinations alleged herein be adjudged and decreed:

(i)   Unreasonable restraints of trade or commerce in violation of Section 1 of the Sherman Act;

(ii)   *Per se* violations of Section 1 of the Sherman Act;

(iii)   Unlawful combinations, trusts, agreements, understandings and/or concerts of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(iv)   Acts of unjust enrichment by Defendants as set forth herein.

B.   GEICO recovers damages, to the maximum extent allowed under each jurisdiction, and that a joint and several judgment in favor of GEICO be entered against all Defendants in each distinct Auto Parts conspiracy in an amount to be trebled to the extent each jurisdiction permits;

C.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other

225

persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, agreements, conspiracies or combinations alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.     GEICO be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

E.     GEICO be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.     GEICO recovers its costs of suit, including reasonable attorneys' fees, as provided by law; and

G.     GEICO recovers such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

GEICO demands a trial by jury of all claims so triable in this matter.

Dated:  July 13, 2018                 Respectfully submitted,

LEWIS ROCA ROTHGERBER CHRISTIE LLP:

*s/ Dan Goldfine*
Dan Goldfine (Adm ED MI, AZ Bar 018788)
dgoldfine@lrrc.com
201 East Washington St.
Suite 1200
Phoenix, AZ  85004
602-262-5392

Frederick J. Baumann (Adm ED MI, CO Bar 12156)
fbaumann@lrrc.com
Diane R. Hazel (Adm ED MI, CO Bar 42954)
dhazel@lrrc.com
1200 17th Street
Suite 3000
Denver, CO 80202

*Attorneys for Plaintiffs except as to The Toyo*
*Defendants*


MYERS & MYERS, PLLC:

*/s Kelly A. Myers*
Kelly A. Myers (P49143)
kmyers@myers2law.com
Rebecca J. Cassell (P64456)
rcassell@myers2law.com
915 N. Michigan Avenue
Howell, MI 48843
(517) 540-1700

*Attorneys for Plaintiffs as to The Toyo Defendants and*
*as local counsel for Plaintiffs' claims*

227